[Cite as *In re E.J.*, 2023-Ohio-1376.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE E.J. | : | |
| | | No. 112209 |
| A Minor Child | : | |
| | | |
| [Appeal by M.J., Mother] | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 27, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD21907572

---

### *Appearances:*

Law Office of Anthony J. Richardson, II, LLC, and
Anthony J. Richardson, II, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

MICHAEL JOHN RYAN, J.:

{¶ 1} Appellant, M.J., the mother ("Mother") of E.J., appeals the judgment of the juvenile court denying her request that legal custody of E.J. be awarded to maternal grandmother, terminating her parental rights, and granting permanent custody of E.J. to appellee the Cuyahoga County Division of Children and Family

Services ("CCDCFS" or the "agency").  After a thorough and careful review of the facts and pertinent law, we affirm.

**Procedural History**

{¶ 2} The agency became involved with the family when E.J. was born in March 2021.[1]  At that time, Mother claimed the child "was the devil," thereby raising concerns for the child's safety.  The child was removed from Mother's custody in March 2021 and remained in CCDCFS's custody, with the same foster family, throughout the pendency of this case in the juvenile court.

{¶ 3} In August 2021, the agency filed a complaint alleging that E.J. was dependent and requesting an order of temporary custody.  The agency's request was granted, and the child was committed to the temporary custody of CCDCFS.  Following the child's removal from Mother, the agency developed a case plan to promote the permanency plan of reunification.  The case plan included services for Mother to address her issues with mental health, parenting, and substance abuse.

{¶ 4} In February 2022, CCDCFS filed a motion to modify temporary custody to permanent custody.  In June 2022, Mother filed a motion requesting that the child be placed with maternal grandmother.  CCDCFS opposed the motion, and the trial court denied the motion.  In July 2022, Mother filed a motion for legal custody to herself or to maternal grandmother.  In November 2022, maternal grandmother filed a motion for allocation of parental rights and responsibilities and/or parenting

---

[1] E.J.'s alleged father has had no involvement in the child's life and never responded to CCDCFS's attempts to contact him.  The juvenile court found that he abandoned the child.  We will not discuss him in this appeal.

time. On the morning of the November 2022 trial, maternal grandmother filed a motion to intervene, which was denied. On November 22, 2022, the trial court journalized its entry for the child in which it denied Mother's motion for legal custody to herself or grandmother, terminated all parental rights and ordered the child placed in the permanent custody of CCDCFS.

**Trial Testimony**

### Mental Health and Substance Abuse Issues

{¶ 5} Mother's case plan required her to obtain treatment for mental health and substance abuse issues. Mother entered an outpatient program with a provider called Exodus to address those issues. According to Mother, she "wasn't getting the help that she needed" from Exodus and she was discharged from the program in August 2021, prior to completion of the services, and was referred for "a higher level of care" for both her mental health and substance abuse issues. The agency referred different services for Mother, but she was not initially willing to return to mental health services. Eventually, Mother indicated that she wanted to return to Exodus, despite the program not being able to accommodate her with the inpatient services it had recommended for her.

{¶ 6} Mother also refused to submit to any — random or requested — drug screens mandated by the agency because, according to her, her drug use was helping her deal with her mental health issues. Mother rejected the suggestion that legal medication could help her manage her mental health issues, stating that she needed marijuana and was going to continue using it.

{¶ 7} Darlene Palmore, a licensed chemical dependency counselor, was assigned to Mother to help her with her substance abuse goals. Palmore testified that Mother displayed erratic behavior, that was concerning to CCDCFS. For example, Palmore testified about an occasion when Mother was threatening suicide and refused help. In another incident that occurred at a July 2022 supervised visit Mother had with E.J., Mother threatened Palmore and security had to physically remove Mother from the building. Mother fought, both verbally and physically, with the security guards during the incident. According to Palmore, Mother eventually stopped communicating with her. It was Palmore's belief that Mother was not leading a sober life.

{¶ 8} CCDCFS caseworker Andrea Flynn also testified about Mother's mental health crises. Flynn testified that, on at least six occasions, she had to call the police or mobile crisis unit to Mother's home because Mother was suicidal. The last time it happened was in September 2022, two months before the trial in this matter. Flynn testified that, as of the time of trial, Mother's mental health was not stable enough for her to participate in a parenting group. Specifically, Flynn had concerns that Mother's participation could jeopardize the safety of the other participants. Flynn continuously advised Mother that she needed to get help with her marijuana use in order to be reunited with her child, but Mother told her that she needed marijuana and needed it in particular to sleep. Flynn testified that "it became more difficult to work with [Mother] because of her mental health" and Mother's unwillingness to engage in mental health services.

{¶ 9} Flynn testified that Mother did engage in services with Ohio Guidestone in the summer of 2022, but after approximately one month of doing so, Mother "fell off." Mother reengaged in services at Ohio Guidestone approximately one month before trial, but Flynn testified that, as of the time of trial, Mother had not made any meaningful progress on her case-plan objectives and would not be able to provide a safe and appropriate home for E.J. in the foreseeable future.

{¶ 10} The record further demonstrates that over the course of the proceedings, Mother threatened CCDCFS and juvenile court staff with physical violence. She also had an outstanding arrest warrant from an incident in which she assaulted two MetroHealth Hospital police officers. Service providers who interacted with Mother had to take safety precautions because of her volatile behavior and did not enter her home alone.

**Maternal Grandmother**

{¶ 11} Maternal grandmother, a licensed foster caregiver, testified that she began fostering Mother when she was approximately one-month old and adopted her when she was approximately three-years old. Mother began experiencing mental health issues — bipolar disorder, depression, behavioral issues, and anxiety — in her adolescence.

{¶ 12} Maternal grandmother testified that she made Mother leave her home when she was 18 years old because she was not compliant with her medication. Grandmother testified that Mother would leave the house with the door open — thereby leaving the house unsecured — and stay out all night; Mother would not tell

her when she planned to return. Mother would also get angry at times and knock things off the wall. Grandmother explained that "[b]ecause [Mother] couldn't follow the house rules, then she was on her own" when she turned 18.

**Mother's Visitation With the Child**

{¶ 13} Mother was scheduled to visit with the child weekly on Fridays, and although her attendance at visits was sporadic, according to Palmore, "[w]hen she would come[,] she engaged pretty well with the baby." After the July 2022 incident, when Mother threatened Palmore, her visits were briefly suspended, and when visitation resumed in September 2022, Mother was inconsistent in attending.

{¶ 14} Because of Mother's volatile behavior, the visits were conducted in the most restrictive setting at the agency building, and during one visit, Mother threatened to abscond with the child. It was discovered that she had a stun gun with her.

**CCDCFS's Efforts Regarding Possible Relative Placement**

{¶ 15} At the time of E.J.'s removal from Mother's custody, CCDCFS approached maternal grandmother about the possibility of her caring for the child, but she stated that "she had other foster children in her home at that time and she wasn't willing for them to move while [E.J.] moved in." However, in January 2022, the maternal grandmother indicated that she had changed her position about caring for E.J. Specifically, the grandmother stated that she felt that her getting E.J. would help Mother with her mental health issues. The agency was concerned about

grandmother's reasoning, which it deemed unrealistic, given Mother's untreated and ongoing mental health issues.

{¶ 16} Mother was initially upset with the idea of maternal grandmother taking care of E.J. Mother called grandmother a "murderer" because Mother's older child died of sudden infant death syndrome while in grandmother's care. Throughout the proceedings, Mother wavered about grandmother having custody of the child, sometimes requesting that the child be placed with grandmother and, at other times, pleading that the child not be placed with her, saying that grandmother "killed my other son" or that grandmother "didn't raise me right, please don't place [E.J.] with her."

{¶ 17} Notwithstanding its concerns about grandmother, the agency offered to provide her the opportunity to meet and interact with the child through virtual visits at the agency. Initially, grandmother declined because it would have interfered with her schedule; however, she did start visiting the child at the agency in summer of 2022.

{¶ 18} The agency also offered grandmother the opportunity to visit with the child in her home, but she was unwilling to transport the child to and from the visitations. Eventually, CCDCFS brought the child to grandmother's home for two visits.

{¶ 19} CCDCFS met with grandmother in May 2022, with the goal of her developing a plan in the event the child was placed with her to keep the child safe if Mother ever posed as a threat. Grandmother said if that ever happened, she would

call 911. According to grandmother, she was "pretty sure" that she could "come up with ways" to protect herself and the child if Mother posed as a threat. She suggested that she could wear an "alert button," but she maintained that she did not think it was necessary; rather, she testified that "the system [i.e., CCDCFS] thinks it's necessary for me to have."

**Guardian Ad Litem**

{¶ 20} E.J.'s guardian ad litem ("GAL") submitted a written report in which she recommended that permanent custody be granted to CCDCFS. At trial, she confirmed that her position remained the same. The GAL explained to the court that Mother had not completed her case-plan objectives. According to the GAL, she did not believe the child would be safe with Mother. The child, who was a little over one and-a-half-years old at the time of trial, was "happy," "part of the family," and "very engaged and very bonded" with the foster family, with whom the child had been with since birth. According to the GAL, breaking E.J.'s bonds with the foster family would be "catastrophic" for the child.

{¶ 21} The GAL stated that the child could "absolutely not" be placed with Mother. In regard to placement with maternal grandmother, the GAL stated that, at that time, grandmother was not willing to do what she needed to do to form and nurture a relationship with her grandchild. She explained that she believed it was "too much" for grandmother because "she had other responsibilities." She was concerned that if grandmother's other responsibilities made it too difficult for her to transport the child for visitation, she would not be able to take care of E.J. "24/7."

{¶ 22} However, the GAL recognized the importance of grandparents in children's lives and believed maternal grandmother should have a role in E.J.'s life — but as a grandmother, not a custodian.

{¶ 23} Based on this evidence, the juvenile court denied Mother's motion for legal custody to herself or grandmother, terminated Mother's parental rights, and granted the agency's motion for permanent custody.

## Assignments of Error

I.      The trial court committed error by terminating appellant and E.J.'s familial rights, where Ohio statutes would be unconstitutional as applied.

II.     The trial court committed error by not granting legal custody of E.J. to his willing, fit grandmother.

## Law and Analysis

### Termination of Parental Rights Supported by Clear and Convincing Evidence

{¶ 24} In her first assignment of error, Mother contends that "termination of her and E.J.'s rights under R.C. Chapter 2151 was unconstitutional as applied, where appellant was fit to raise and parent [E.J.] and where E.J.'s grandmother was willing to accept legal custody and keep E.J. in the family."  Although couched in terms of a constitutional challenge, the substance of Mother's argument is one of weight of the evidence and that is how we will analyze it.

{¶ 25} With regard to a challenge based upon manifest weight of the evidence, the Supreme Court of Ohio has explained:

"Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue

rather than the other. It indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their [judgment], if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶ 26} When conducting a manifest-weight review, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984).

{¶ 27} Therefore,

[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re Satterwhite*, 8th Dist. Cuyahoga No. 77071, 2001-Ohio-4137. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding (i.e., observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. *Id.*, citing *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

*In re C.T.*, 8th Dist. Cuyahoga No. 87159, 2006-Ohio-1944, ¶ 15.

{¶ 28} We begin our analysis with the recognition that, while a parent's right to raise a child is an essential and basic civil right, *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), children have the right to "parenting from either [biological] or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

{¶ 29} R.C. 2151.414, Ohio's permanent-custody statute, provides that the juvenile court's judgment granting permanent custody must be supported by clear and convincing evidence. Clear and convincing evidence has been defined as

> "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required beyond a 'reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. We will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence. *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48; *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

{¶ 30} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any

of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists and, furthermore, permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 31} Under the first prong of the permanent-custody analysis, the juvenile court is to determine if any of the following factors exists: whether the child is abandoned (R.C. 2151.414(B)(1)(b)); whether the child is orphaned and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); whether the child has been in the temporary custody of public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); whether another child of the parent has been adjudicated as abused, neglected, or dependent on three separate occasions (R.C. 2151.414(B)(1)(e)); or, when none of these factors apply, whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents" (R.C. 2151.414(B)(1)(a)).

{¶ 32} Here, the trial court found under R.C. 2151.414(B)(1)(a) that "the child cannot be placed with either the Mother or alleged father within a reasonable time or should not be placed with Mother or alleged father." In making this finding, the trial court relied on the factors set forth in R.C. 2151.414(E), the finding of any one of which requires the "cannot or should not be placed" finding. Specifically, R.C. 2151.414(E) states, in pertinent part, that "[i]f the court determines, by clear and convincing evidence, * * * that one or more of the [enumerated (E) factors] exist as

to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]"

{¶ 33} Under R.C. 2151.414(E)(1), the trial court found that Mother failed to remedy the conditions that led to the child's removal. The record demonstrates that a case plan was implemented for Mother at the outset of the child's removal in March 2021. The plan required her to address her issues with mental health, parenting, and substance abuse. However, Mother was not successful in achieving the goals of her case plan. Throughout the proceedings, Mother maintained that she would not stop her marijuana use, contending that it helped her sleep and with her mental health issues.

{¶ 34} Further, Mother refused to engage in mental health services for approximately a year between August 2021 and summer 2022. According to caseworker Flynn, Mother's mental health was not stable enough to allow her to participate in a parenting group; the agency feared Mother's participation would put the other participants in an unsafe situation. Indeed, the service providers who interacted with Mother took safety precautions and would not enter her home alone due to her volatile behavior. Thus, as of the time of trial, Mother had not made any meaningful progress on any of her case-plan objectives and was not able to provide a safe and appropriate home for E.J. in the foreseeable future.

{¶ 35} On this record, the trial court's finding that Mother failed to remedy the conditions leading to E.J.'s removal was supported by clear and convincing evidence.

{¶ 36} The trial court also made a finding under R.C. 2151.414(E)(2) that Mother had chronic mental illness and chemical dependency that was so severe that it made her unable to provide an adequate, permanent home for E.J. as of the time of trial and, as anticipated, within one year after trial. The record demonstrates that Mother rejected the offer to obtain legal medication to help with her issues and, instead, insisted on self-medicating with marijuana. She specifically stated that she was not going to stop using marijuana. Indeed, Mother acknowledges her "cannabis addiction and an attitude which led to incontrollable outbursts." Appellant's brief, p. 10.

{¶ 37} We are not persuaded by Mother's insinuation that her drug use did not interfere with her ability to parent E.J. because she "only" used marijuana and it helped with her mental health issues. Nonmedical marijuana use in Ohio is illegal, and its use impairs judgment. *See In re G.H.*, 10th Dist. Franklin No. 15AP-752, 2016-Ohio-1188, ¶ 34. Mother could have sought medical marijuana, which, if prescribed, would have subjected her use to supervision under the care of a medical professional. But she rejected the idea of using legal medication to help with her issues. Additionally, Mother's marijuana use was not the agency's sole concern.

{¶ 38} Further, the record does not bear out Mother's insinuation that her marijuana use helped with her mental health issues — those issues continued

throughout the proceedings, including at trial where Mother had numerous outbursts, that resulted in several admonishments and her removal from the courtroom on more than one occasion.

{¶ 39} Further, the record shows that Mother has had mental health issues dating back to her adolescence, at which time she was not compliant with her medications and resulted, in part, with maternal grandmother not allowing her to live with her after the age of 18. In these proceedings, Mother failed to consistently engage in mental-health services, at one point going approximately one year without engagement. Her mental-health issues continued throughout the pendency of this matter and included erratic, violent behaviors and repeated threats of suicide. As the GAL noted in her written report, "most experiences with [Mother] were erratic, threatening, awkward and confusing." On this record, the trial court's finding under R.C. 2151.414(E)(2) regarding Mother's chronic mental illness and chemical dependency was supported by clear and convincing evidence.

{¶ 40} R.C. 2151.414(E)(4) allows a juvenile court to make a finding that a parent has demonstrated a lack of commitment toward his or her child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. The trial court made a finding under this section in regard to Mother. The record shows that Mother was advised that she needed to stop using mind-altering substances in order to have a chance at reunification with E.J. Mother told caseworker Flynn that she was not going to stop using marijuana because she

needed it, in particular to sleep. She rejected exploring legal medication to help her with her issues. This evidence supports the trial court's finding of Mother's lack of commitment.

{¶ 41} The trial court also made a finding under R.C. 2151.414(E)(14) that Mother was unwilling to provide for E.J. Again, this finding is supported by Mother's unwillingness to consistently engage in mental-health services and her statement that she was going to continue her marijuana use, despite being advised that her failure to make significant progress in those areas would hamper her ability to be reunified with the child.

{¶ 42} Thus, the trial court's findings under R.C. 2151.414(E) are supported by clear and convincing evidence in the record. Because the statute mandates that if the trial court finds, by clear and convincing evidence, that "one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent," the trial court properly found that E.J. cannot or should not be placed with Mother within a reasonable period of time. *See, e.g.*, *In re I.R.*, 2021-Ohio-3103, 179 N.E.3d 138, ¶ 69 (8th Dist.) (based on its findings under R.C. 2151.414(E), the juvenile court was required to find that the child could not be placed with either of his parents within a reasonable time or should not be placed with either parent), citing *In re C.H.*, 8th Dist. Cuyahoga Nos. 82258 and 82852, 2003-Ohio-6854, ¶ 58.

{¶ 43} We now consider the second prong of a motion for permanent custody, that is, the best interest of the child. In determining the best interest of the child, R.C. 2151.414(D) mandates that the juvenile court consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 44} This court reviews a trial court's best-interest determination under R.C. 2151.414(D) for an abuse of discretion. *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 55 (8th Dist.), citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. In this regard, "'[a] trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion.'" *In re J.F.* at *id.*, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 60. Further, although the juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), no one factor is to be given greater weight than the others.

*In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶ 45} The trial court here considered the factors under R.C. 2151.414(D) and found that "a grant of permanent custody is in the best interests of the child." The trial court did not abuse its discretion in making this finding.

{¶ 46} In regard to Mother's interaction and relationship with E.J., the record demonstrates that she was scheduled to visit with the child weekly on Fridays. Her attendance at the visits were sporadic, including an approximate two-month period where she did not visit at all, but when she did visit, she "engaged pretty well with the baby." The child was well-bonded to the foster family with whom the child had been placed since birth and, according to the GAL, breaking those bonds would be "catastrophic" for E.J. The GAL recommended permanent custody to CCDCFS. Although Mother interacted well with E.J. during visits, this court has stated that "'the mere existence of a good relationship is insufficient. Overall, we are concerned with the best interest of the child, not the mere existence of a relationship.'" *In re K.M.*, 8th Dist. Cuyahoga No. 95374, 2011-Ohio-349, ¶ 23, quoting *In re R.N.*, 8th Dist. Cuyahoga No. 83121, 2004-Ohio-2560.

{¶ 47} In regard to the child's need for a legally secure permanent placement, the trial court found that E.J. cannot or should not be placed with Mother. Such a finding precluded the trial court from considering returning the child to Mother. *See In re Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379, 20-21 (July 27, 2000) (after finding that a child cannot

or should not be placed with a parent, the trial court is required by statute to place the child with someone other than the parent).

{¶ 48} In regard to the R.C. 2151.414(E) factors, as discussed, the juvenile court found that several applied here, those being that Mother (1) failed to remedy the conditions which led to E.J.'s removal; (2) had chronic mental health and chemical dependency issues; (3) demonstrated a lack of commitment toward the child; and (4) demonstrated an unwillingness to provide for the child.

{¶ 49} On this record, the trial court's finding that granting CCDCFS permanent custody of E.J. was in the child's best interest was not an abuse of discretion.

{¶ 50} The first assignment of error is overruled.

**Denial of Legal Custody to Maternal Grandmother**

{¶ 51} In her second assignment of error, Mother contends that the juvenile court erred by not granting legal custody of E.J. to maternal grandmother. We disagree.

{¶ 52} The juvenile court may award legal custody of a child who has been adjudicated abused, neglected, or dependent to any person who filed a motion requesting legal custody of the child. R.C. 2151.353(A)(3).

> "Legal custody" [is] a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

R.C. 2151.011(B)(21).

{¶ 53} Following an adjudication of abuse, neglect, or dependency, a juvenile court awards legal custody "'by examining what would be in the best interest of the child based on a preponderance of the evidence.'" *In re T.R.*, 8th Dist. Cuyahoga No. 102071, 2015-Ohio-4177, ¶ 44, quoting *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 11, 14. A "preponderance of the evidence" means evidence that is "'more probable, more persuasive, or of greater probative value.'" *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7, quoting *In re D.P.*, 10th Dist. Franklin Nos. 05AP-117, 05AP-118, 2005-Ohio-5097, ¶ 52.

{¶ 54} When considering the best interest of a child in a legal custody matter, "there is no 'specific test or set of criteria' that must be applied or considered." *In re T.R.* at ¶ 48. However, this court has found the factors delineated in R.C. 2151.414(D) to be "instructive." *In re D.T.*, 8th Dist. Cuyahoga Nos. 100970 and 100971, 2014-Ohio-4818, ¶ 20, citing *In re E.A.*, 8th Dist. Cuyahoga No. 99065, 2013-Ohio-1193, ¶ 13. As discussed, the factors listed in R.C. 2151.414(D) include the interaction of the child with the child's parents, siblings, relatives, and foster caregivers; the custodial history of the child, including whether the child has been in the temporary custody of a public children services agency and for how long; and the child's need for a legally secure permanent placement.

{¶ 55} The decision whether to grant a request for legal custody is within the discretion of the juvenile court. *In re M.S.*, 8th Dist. Cuyahoga No. 108567, 2019-Ohio-5128, ¶ 33. We will not reverse an award of legal custody absent a showing of

an abuse of discretion. *In re B.H.*, 8th Dist. Cuyahoga No. 95794, 2011-Ohio-1967,

¶ 10. An abuse of discretion occurs when a court exercises its judgment in an

unwarranted way regarding a matter over which it has discretionary authority.

*Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35.

{¶ 56} The record demonstrates that maternal grandmother did not

demonstrate full commitment to E.J.'s needs. She initially declined to take the child

because the responsibility would have conflicted with her other obligations. There

were also significant periods of time where she did not visit with the child because

she either could not or would not provide transportation for E.J. The record further

demonstrates that grandmother's plans to keep E.J. safe were undeveloped or

unrealistic.

{¶ 57} We are not persuaded by Mother's citation to R.C. 2151.353(A)(3)(c)

in support of her contention that by not granting legal custody to grandmother, the

juvenile court impermissibly foreclosed her chance of regaining custody of E.J. in

the event of her rehabilitation. R.C. 2151.42(B) specifically states that an order of

legal custody is intended to be permanent; it is not intended as a means to afford a

parent additional time to remedy the issues that led to agency involvement in the

first place.

{¶ 58} "'Courts are not required to favor a relative if, after considering all the

factors, it is in the child's best interest for the agency to be granted permanent

custody.'" *In re S.F.*, 2d Dist. Montgomery No. 28606, 2020-Ohio-693, ¶ 50,

quoting *In re A.A.*, 2d Dist. Greene No. 2008 CA 53, 2009-Ohio-2172, ¶ 19. Here, in

consideration of all the best interests factors, along with the GAL's opinion that removing E.J. from the only family the child has known since birth and to whom the child is "very bonded," would be "catastrophic," we find no abuse of discretion in the trial court's denial of Mother's request for legal custody to grandmother.

{¶ 59} The second assignment of error is overruled.

{¶ 60} Finally, we address two general contentions Mother has made in this appeal. Specifically, Mother contends that the juvenile court erred in rendering its decision without the aid of expert testimony or a specific determination of her unsuitability to parent the child.

{¶ 61} In regard to expert testimony, this court has held that where mental health is an issue, but not a predominant issue nor the determinative issue, in a permanent custody case, due process does not require the court to appoint a psychiatric expert to assist in the defense. *In re M.W.*, 8th Dist. Cuyahoga No. 83409, 2005-Ohio-1305, ¶ 5; *In re J.D.*, 8th Dist. Cuyahoga No. 82898, 2004-Ohio-358, ¶ 9; *In re B.G.*, 8th Dist. Cuyahoga No. 81982, 2003-Ohio-3256, ¶ 24. The juvenile court here did not explicitly nor solely base its decision to terminate Mother's parental rights based on her chronic mental illness. Thus, it cannot be said that Mother's mental health issues were the determinative factor in the court's decision. Following this court's precedent, we find no merit to Mother's contention.

{¶ 62} In regard to the lack of an unsuitability finding, the Supreme Court of Ohio has held that "[a] juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a

determination of the unsuitability of the child's custodial and/or noncustodial parents." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 23. Here, the juvenile court found E.J. dependent. That adjudication carries with it the implicit finding of parental unsuitability. The juvenile court was, therefore, not obligated to make a separate finding of unsuitability prior to awarding CCDCFS permanent custody.

{¶ 63} Having found no merit to Mother's assignments of error, the trial court's judgment is affirmed.

{¶ 64} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EMANUELLA D. GROVES, J., CONCUR