[Cite as *In re F.B.*, 2025-Ohio-5528.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE  F.B., ET AL.

Minor Children

[Appeal by  A.C., Mother]

:
:
:
:
:
:
:

No. 115271

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  December 11, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD23906987 and AD23906988

---

*Appearances:*

Caitlin E. Monter, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Appellant mother A.C. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her children, F.B. (dob: 8/27/2012) and H.C. (dob: 10/13/2014) (collectively known as "the children") to the Cuyahoga County Division of Children and Family Services

("CCDCFS" or "the agency"). Mother claims that the juvenile court's decision to grant permanent custody to the agency is not supported by sufficient evidence and is against the manifest weight of the evidence.

{¶ 2} Our review of the record reflects that sufficient evidence exists to support the juvenile court's findings and order granting permanent custody to the agency. We further find that the juvenile court's decision is not against the manifest weight of the evidence.

## I. Procedural History and Relevant Facts

### A. Previous Cases With the Agency

{¶ 3} In April 2015, the agency filed a complaint with juvenile court for dependency and protective supervision of one of Mother's children, H.C. The complaint alleged that at the time of birth Mother's child, H.C. tested positive for opiates and benzodiazepines. At the same time, Mother also tested positive for benzodiazepine. H.C. was adjudicated dependent, and the agency was granted protective supervision. In August 2016, juvenile court awarded legal custody of H.C. back to Mother.

### B. This Case

{¶ 4} In June 2023, the agency filed another complaint with the juvenile court alleging the children, along with the children's two younger siblings, were

neglected and dependent.[1]  The agency also requested that the agency be granted temporary custody.

{¶ 5} The complaint noted that (1) Mother has a substance-abuse problem related to amphetamine and methamphetamine that she had failed to adequately address,   (2) Mother lacks the judgment and parenting skills necessary to provide safe and adequate care for the children, (3) Mother has mental-health issues for which she does not consistently participate in recommended services or take prescribed medication, and (4) J.P., the father of one of the younger siblings and alleged father of another, is a convicted Tier II sex offender and Mother allows him to have unsupervised access to the children.  The complaint further noted that the father of F.B. is currently incarcerated for a conviction of drug possession.  The father of H.C. is unknown.  The agency also filed a request for Juv.R. 13(B) temporary orders requesting an order granting predispositional temporary custody of the children to the agency pending a resolution of the agency's request for temporary custody.

{¶ 6} A hearing was held on June 26, 2023.  Afterward, the magistrate issued an order finding probable cause for the removal of the children from the home and committed the children to predispositional emergency temporary custody to the agency.  The children have remained in the custody of the agency since that time.

---

[1] The two younger siblings were later placed into the custody of their father, J.P.  Mother also has a fifth child that tested positive for amphetamines when born in April 2025 while this case was pending.  The youngest child is currently in the custody of the agency and not subject to this appeal.

After a dispositional hearing held on October 20, 2023, the magistrate issued an order terminating predispositional emergency custody and granting temporary custody to the agency.

### C. Permanent Custody Hearing and Appeal

{¶ 7} On April 10, 2024, the agency filed a motion to modify temporary custody of the children and requested permanent custody be given to the agency. A permanent-custody hearing was held on May 16, 2025. Mother and her counsel were present, along with the children's guardian ad litem Cynthia Ernst ("GAL Ernst"), the children's counsel, social worker for the agency Deja Arthur ("Arthur"), and counsel for the agency.

{¶ 8} The agency's extended services worker, Deja Arthur, testified on behalf of the agency. GAL Ernst also filed a report with her recommendation to the court. Mother did not present any witnesses.

{¶ 9} The relevant testimony will be summarized below.

#### 1. Deja Arthur

{¶ 10} Deja Arthur is an extended services worker in the START department within the agency. The START department is a unit within the agency that deals with cases that involve parents that use drugs while pregnant and the children that are exposed to those drugs in utero. Arthur stated that she works with a partner and that together they work with the parents to make referrals to various treatment programs.

{¶ 11} Arthur was assigned to this case in May 2023. Arthur testified that paternity was established for F.B. and that the biological father of H.C. is currently unknown.

{¶ 12} Arthur advised that Mother had a history with the agency prior to this case. She stated that the agency had received a total of ten referrals since 2012 concerning Mother, the majority of which involved substance abuse. The children were never removed from her custody pertaining to those prior referrals.

{¶ 13} In January 2023, the agency became involved in this case because of Mother and her newborn child testing positive for amphetamines. Mother initially claimed that she had mistakenly taken one of her sister's Adderall pills. Mother later admitted she lied and that her "whole family uses." To prevent the removal of Mother's children at that time, the agency referred Mother to services, provided her with a sponsor and peer support, and recommended meetings for her to attend.

{¶ 14} Arthur testified that Mother kept testing positive for drugs, particularly amphetamine and methamphetamine. The children were eventually removed from Mother's custody in June 2023. Arthur testified that when the children were removed, the agency also had mental-health concerns regarding Mother as well. She was also living with her younger children's father, J.P., at the time. Arthur described Mother's relationship with J.P. as volatile.

{¶ 15} A case plan was developed with a goal for reunification. Arthur testified that F.B.'s father was not included in the case plan because he was incarcerated for drug-related offenses when F.B. entered the agency's custody.

F.B.'s father was still incarcerated at the time of the permanent custody hearing, with a possible release date of October 2025. There was no father included in the case plan for H.C.

{¶ 16} The case plan included services for Mother for substance abuse, mental health, housing, parenting, domestic violence, and codependency. With respect to Mother's substance-abuse and mental-health issues, Arthur stated that Mother had previously been diagnosed with bipolar disorder, ADHD, and depression and that she was first referred to New Visions early in 2023 after Mother tested positive for drugs when she gave birth to her newborn child in January of that year. Mother participated in "IOP" through New Visions but did not complete the program because she was discharged for continuing to test positive for drugs.

{¶ 17} After being discharged from New Visions, Mother was referred to Ethan's Crossing in the partial hospitalization program that is a higher level of care than at New Visions. Arthur testified that all the referrals made were for both substance-abuse and mental-health issues. Mother did not complete the program at Ethan's Crossing and was discharged because of absences.

{¶ 18} Following her discharge from Ethan's Crossing, Mother was referred to Moore's Counseling. Mother was unsuccessfully discharged from Moore's Counseling as well.

{¶ 19} After being discharged from Moore's Counseling, Mother was referred to another treatment program, Nora's, for mental-health and substance-abuse

treatment. This referral took place sometime in 2024. Arthur testified that Mother completed this program in the summer of 2024.

{¶ 20} Following the completion of the program at Nora's, Mother was recommended for aftercare and to participate in drug testing with the agency, which Mother did not do. Arthur testified that Mother stopped drug testing for the agency in June 2024. As a result, the agency was unable to determine if Mother was sober. Arthur stated that Mother disclosed to one of the workers that she knew when not to test so that it would not "come up positive." Arthur believed that Mother was trying to manipulate the testing procedure.

{¶ 21} In October 2024, Mother relapsed. She admitted to taking a THC gummy. THC was a drug of choice for Mother in the past. As a result, Mother was referred to a new treatment program at Signature Health, which she did not follow through with. She was subsequently referred to Women's Recovery, which she also did not follow through with.

{¶ 22} Mother was eventually referred to Matt Talbot, which she began attending in January 2025. Upon entering the Matt Talbot program, she was screened and tested positive for cocaine, THC, and benzodiazepines. Mother completed the program in March 2025. After release from Matt Talbot, Mother was required to continue urine screens once a week with the agency. Mother did not comply with any urine screens. It was also recommended Mother engage in IOP, get an assessment, and enter residential sober living. Mother was not willing to

comply with the residential-sober-living recommendation. With respect to IOP, Mother went to one class and did not complete an assessment.

{¶ 23} Arthur testified that Mother relapsed after she had been discharged from Matt Talbot. The day before the birth of her youngest child in April 2025, Mother tested positive for multiple drugs including THC, cocaine, suboxone, benzodiazepines, and amphetamines. After the child was born, Mother was again referred for treatment at Signature Health. Mother did not comply with that referral. Arthur stated that as of the date of the permanent custody hearing Mother had not reengaged with any substance-abuse or mental-health treatment.

{¶ 24} With respect to the medication Mother was taking for her mental health, Arthur stated that Mother was not consistent in taking her medication. Mother stated that she did not like the way the medication made her feel. Mother eventually stopped taking her medication altogether, without her doctor's permission. Arthur testified that she does not know whether Arthur was taking her medication at the time of the hearing.

{¶ 25} Parenting was also part of the case plan. Arthur testified that the agency had observed Mother having inappropriate conversations with the children in the past. The agency believed that Mother could benefit from parenting classes. Mother completed a parenting program. Notwithstanding Mother having completed a parenting program, Arthur testified that she continues to have some concerns pertaining to Mother's judgment. Arthur stated that she has recently

observed Mother having inappropriate conversations in front of the children concerning J.P. and his new girlfriend.

{¶ 26} Domestic violence was also included in the case plan because Mother had stated that there was emotional abuse occurring in the home. The children also disclosed that domestic violence had occurred in the home between Mother and J.P. Specifically, the children mentioned that they had seen J.P. punch Mother in the mouth.

{¶ 27} While Mother completed a domestic-violence program, Arthur testified that she still has concerns about domestic violence. Arthur explained that the concerns relate to Mother's continued relationship with J.P. In September 2024, the police were called to J.P.'s home because she refused to leave. In November, Mother had to call the police because J.P. was at her home harassing her and refused to leave.

{¶ 28} Around January 2025, a temporary no-contact order was issued between Mother and J.P. Arthur testified that the no-contact order has been violated since it has been in place. Arthur stated that at the birth of Mother's youngest child, J.P. was at the hospital in the room with Mother multiple times.

{¶ 29} Codependency counseling was also included in the case plan because of Mother's heavy reliance on her relationship with J.P. Mother was referred for services to address her codependency issues with Signature Health. Mother did not participate in that service. Arthur testified that as of the time of the permanent custody hearing, Mother's relationship with J.P. was still a problem. Arthur

explained that J.P. is still paying her rent and they continue to have back and forth disputes with each other through text messages.

{¶ 30} Arthur stated that the children have expressed to her that they want to live with their Mother. However, Arthur stated that she believes that the children are beginning to understand that Mother may not be able to parent them in the future.

### 2. GAL Ernst's Recommendation

{¶ 31} GAL Ernst filed a report with the juvenile court on May 13, 2025. In the report, GAL Ernst recommended that permanent custody of the children be granted to the agency. She explained that Mother has been unable to maintain sobriety for significant periods of time. She concluded that granting permanent custody of the children to the agency was in the children's best interests.

### 3. Order and Appeal

{¶ 32} On June 18, 2025, the juvenile court issued an order granting permanent custody of the children to the agency. It is from this order that Mother appeals, raising the following assignment of error:

> The trial court erred by granting permanent custody of [the children] to the agency against the sufficiency and manifest weight of the evidence.

## II. Law and Argument

{¶ 33} As always, we begin our discussion by recognizing that "'[a]ll children have the right, if possible, to parenting from either biological or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re L.W.,*

2017-Ohio-657, ¶ 21 (8th Dist.), quoting *In re J.B.,* 2013-Ohio-1704, ¶ 66 (8th Dist.). And that a parent's right to raise their children is an essential basic civil right. *In re Z.L.,* 2025-Ohio-4852, ¶ 32 (8th Dist.); *In re L.W.* at ¶ 21. In determining whether "to terminate an individual's parental rights to their children, the goal is to ensure a more stable life for the children and to facilitate adoption to foster permanency for the children." *In re Z.L.* at ¶ 32, quoting *In re U.B.,* 2025-Ohio-1265, ¶ 22 (8th Dist.). In doing, "it must only be done as an "'alternative of last resort.'"" *Id.* at ¶ 33, quoting *L.W.* at ¶ 21, quoting *In re Gill,* 2002-Ohio-3242, ¶ 21 (8th Dist.).

{¶ 34} Mother presents one assignment of error for our review consisting of two separate issues alleging that the trial court's decision (1) was not supported by sufficient evidence, and (2) was against the manifest weight of the evidence. Since these issues overlap with respect to the arguments and evidence presented, we will address them together.

**A. Standard of Review**

{¶ 35} A challenge to the sufficiency of the evidence and a claim that the lower court's decision is against the manifest weight of the evidence are two distinct concepts that are ""both quantitatively and qualitatively different."" *In re Z.C.,* 2023-Ohio-4703, ¶ 13, quoting *Eastley v. Volkman,* 2012-Ohio-2179, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. The Ohio Supreme Court has explained that "sufficiency is a test of adequacy." *Thompkins* at 386. While a manifest-weight challenge concerns "'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather

than the other.'" (Emphasis in original.) *Thompkins* at 387, quoting *Black's Law Dictionary* (6th Ed. 1990). "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when the evidence is legally sufficient to support the jury verdict as a matter of law." (Cleaned up.) *Z.L.* at ¶ 39.

{¶ 36} However, "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12.

> When reviewing for manifest weight in permanent custody cases, we "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."

*In re Z.L.,* 2025-Ohio-4852, at ¶ 40 (8th Dist.), quoting *In re Z.C.* at ¶ 14.

{¶ 37} "'When weighing the evidence, we must always be mindful of the presumption in favor of the finder of fact.'" *In re Z.L.* at ¶ 41, quoting *In re L.A.,* 2024-Ohio-5103, ¶ 17 (8th Dist.), citing *In re Z.C.* at ¶ 14. The Ohio Supreme Court has noted that the "'underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *In re Z.C.* at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). "'"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and

judgment, most favorable to sustaining the verdict and judgment.'"" *In re G.J.,* 2025-Ohio-4854 (8th Dist.)*,* quoting *Seasons Coal Co., Inc.* at 80, fn. 3, quoting 5 Ohio Jur.3d, Appellate Review, § 603, at 191-192 (1978).

### B.     Permanent Custody Under R.C. 2151.414

{¶ 38} "R.C. 2151.414 governs permanent-custody determinations in Ohio and sets forth a two-prong analysis." *In re G.J.* at ¶ 22. A juvenile court is authorized to grant permanent custody if the court finds, by clear and convincing evidence, that (1) one or more of the conditions set forth in R.C. 2151.414(B)(1)(a)-(e) exist, and (2) the grant of permanent custody is in the child's best interest. R.C. 2151.414(D)(1)/(2).

{¶ 39} Clear and convincing evidence has been defined as "'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.,* 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford,* 161 Ohio St. 469 (1954). "'"We will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence."'" *In re Z.L.* 2025-Ohio-4852, at ¶ 35 (8th Dist.), quoting *In re U.B.,* 2025-Ohio-1265, at ¶ 23 (8th Dist.), quoting *L.A.* at ¶ 17.

### C. Analysis

**First Prong – R.C. 2151.414(B)(1)**

{¶ 40} Pursuant to R.C. 2151.414(B)(1)(a), the juvenile court found that the children "cannot be placed with either of the child[ren's] parents within a reasonable time or should not be placed with the child[ren's] parents." The trial court made this finding utilizing the factors set forth in R.C. 2151.414(E), which provides that "[i]f the court determines, by clear and convincing evidence . . . that one or more of the following [factors set forth in R.C. 2151.414(E)] exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]"

{¶ 41} Here, the trial court determined that multiple factors set forth in subsection (E) of R.C. 2151.414 exist, including (1) the parents' failure to remedy the problems that caused the children to be placed outside the home under subsection (E)(1); (2) the chronic mental illness or chemical dependency of the parent is so severe that it makes the parent unable to provide an adequate permanent home for the children under subsection (E)(2); and (3) that the parent has demonstrated a lack of commitment towards the children by failing to regularly support, visit, or communicate with the children when able to do so under subsection (E)(4).

{¶ 42} Only one of these factors is required to be met for the court to make the determination that a child cannot or should not be placed with a parent, thereby satisfying R.C. 2151.414(B)(1)(a). *In re A.E.,* 2025-Ohio-1466, ¶ 14 (8th Dist.), citing

*In re L.V.*, 2024-Ohio-5917, ¶ 53 (8th Dist.). As such, we are not required to address each factor, so long as one of the factors set for in subsection (E) is met. *Id.*

## R.C. 2151.414(E)(1) Factor

{¶ 43} With respect to subsection (E)(1), the court found "the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren's] home." There is credible evidence in the record demonstrating that Mother has failed to remedy the conditions that caused the children to be removed from the home.

{¶ 44} It must first be noted that F.B.'s father was not included in the case plan because he was incarcerated for drug-related offenses when F.B. entered the agency's custody. He was still incarcerated at the time of the permanent-custody hearing, with a possible release date of October 2025. There was no father included in the case plan for H.C., since H.C.'s father is currently unknown.

{¶ 45} After the children were removed and placed into the temporary custody of the agency, a permanency plan was put in place with the goal of reunifying the children with Mother. The case plan included services for Mother for substance abuse, mental health, housing, parenting, domestic violence, and codependency. As discussed above, Arthur testified that Mother has been referred to multiple programs to remedy these issues. Mother has failed to complete a number of these programs. And with the programs Mother has completed, she has failed to adequately allay the agency's concerns.

{¶ 46} Concerning Mother's substance-abuse issues, Arthur testified that on the day before the birth of her youngest child in April 2025, which was a month prior to the permanent-custody hearing, Mother tested positive for multiple drugs, including THC, cocaine, suboxone, benzodiazepines, and amphetamines. After the child was born, Mother was again referred for treatment at Signature Health. Mother did not comply with this referral. Arthur stated that as of the date of the permanent-custody hearing, Mother had not reengaged with any substance-abuse or mental-health treatment. The juvenile court noted that "[M]other has been in five different treatment programs but does not have a sobriety date."

{¶ 47} The evidence presented at trial was sufficient not only to satisfy the 2151.414(E)(1) factor, that Mother has failed to remedy the conditions that were the cause for removal, the evidence was also sufficient to satisfy the court's finding that Mother's chronic chemical dependency makes Mother unable to provide an adequate permanent home for the children under (E)(2).

{¶ 48} Mother directs us to several programs she completed while working with the agency. However, this fact is not dispositive. Even if Mother had completed the case plan, or even programs within the plan, we have recognized that "such a plan is 'a means to a goal, but not the goal itself.'" *In re T.B.,* 2025-Ohio-2075, ¶ 56 (8th Dist.), quoting *In re C.C.,* 2010-Ohio-780, ¶ 25 (8th Dist.). Nor would it "preclude a grant of permanent custody to a social services agency." *In re C.C.* at ¶ 25, citing *In re J.L.,* 2004-Ohio-6024, ¶ 20 (8th Dist.). "'"The issue is not whether the parent has substantially complied with the case plan, but whether the parent has

substantially remedied the conditions that caused the child's removal.'"" *In re M.T.,* 2024-Ohio-3111, ¶ 51 (8th Dist.), quoting *In re J.B.,* 2013-Ohio-1704, at ¶ 90 (8th Dist.), quoting *In re McKenzie,* 1995 Ohio App. LEXIS 4618 (9th Dist. Oct. 18, 1995).

{¶ 49} Here, Arthur testified with respect to several referrals to different programs offered by the agency during this case. Some of these programs Mother participated in and completed; others Mother either refused to participate or failed to complete. Nonetheless, Arthur testified that over the previous two years, there is nothing she has seen to lead her to believe that Mother is able to parent the children safely in the foreseeable future. And Mother was testing positive for drugs as recently as April 2025.

{¶ 50} For these reasons, there exists sufficient evidence in the record to support the juvenile court's finding under R.C. 2151.414(E)(1) that Mother failed to remedy the conditions that caused removal of the children from the home, particularly with respect to Mother's chemical-dependency issues.

{¶ 51} Nonetheless, Mother claims that the court's finding is against the manifest weight of the evidence. As with any manifest-weight analysis, we are reminded that "'[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *In re Z.C.,* 2023-Ohio-4703, at ¶ 14, quoting *Seasons Coal Co., Inc.,* 10 Ohio St.3d at 80, fn. 3. The juvenile court was in the best position to weigh the proffered testimony of the evidence presented. *See id.* at ¶ 14. The agency presented sufficient

evidence in support of the finding that Mother has failed to remedy the conditions that led to the removal of the children, and there is nothing in the record that would urge us to substitute our judgment for that of the juvenile court.

{¶ 52} Since only one of the factors set forth under subsection (E) of 2151.414 is required to be met in order to determine that a child cannot or should not be placed with a parent, we decline to address the remaining (E) factors that the court found. *See In re A.E.,* 2025-Ohio-1466, at ¶ 14 (8th Dist.).

{¶ 53} As such, the juvenile court's finding under R.C. 2151.414(B)(1)(a), that the children cannot be placed with either of the children's parents within a reasonable time or should not be placed with the children's parents, is supported by the record.

### Second Prong – Best Interests of the Children – R.C. 2151.414(D)(1) and/or (D)(2)

{¶ 54} "'The best interests of the child are paramount in any custody case,' and courts are to liberally interpret the statutes under R.C. 2151 'to provide for the care and protection of the child . . . .'" *In re A.E.* at ¶ 15, quoting *In re A.B.,* 2006-Ohio-4359, ¶ 32. In determining whether permanent custody is in the best interests of a child, the juvenile court must consider the relevant factors set forth in either R.C. 2151.414(D)(1) or (D)(2). Here, the juvenile considered the factors set forth in R.C. 2151.414(D)(1). Mother disputes the juvenile court's determination that granting permanent custody of the children to the agency is in the children's best interests.

{¶ 55} We must first note that when considering the factors set forth in R.C. 2151.414(D)(1), the juvenile court is not required "to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.,* 2020-Ohio-5102, ¶ 31. Rather, "[c]onsideration is all the statute requires." *Id.* Nonetheless, the Ohio Supreme Court has noted that even though juvenile courts are not required to expressly discuss each factor, the Court has encouraged juvenile courts to address each factor in order to help aid in appellate review. *In re A.M.* at ¶ 32.

{¶ 56} After a thorough review of the record, we find that the evidence was sufficient to support the juvenile court's determination that permanent custody with the agency is in the best interests of the children. In doing so, the juvenile court's judgment entry expressly indicates that it considered all relevant factors set forth in R.C. 2151.414(D)(1), as discussed below.

### R.C. 2151.414(D)(1)(a) Factor

{¶ 57} The first factor set forth in R.C. 2151.414(D)(1)(a) requires the juvenile court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home provides, and any other person who may significantly affect the child[.]" The juvenile court found that this factor weighed in favor of permanent custody.

{¶ 58} Arthur testified that despite Mother's participation in multiple services over the previous two years, she continues to have concerns about whether Mother can safely parent the children. Arthur explained that Mother does well

during the visits with the children and "interacts very well with [them.]" Arthur stated Mother brings food, snacks, and crafts to the scheduled visits. Arthur also indicated that the children are very bonded with Mother. With that said, we have cautioned that "'the mere existence of a good relationship is insufficient. Overall, we are concerned with the best interest of the child, not the mere existence of a relationship.'" *In re K.M.,* 2011-Ohio-349, ¶ 23 (8th Dist.), quoting *In re R.N.,* 2004-Ohio-2560 (8th Dist.). "'[A] child's best interests require permanency and a safe and secure environment.'" *Id.,* quoting *In re Holyak,* 2001 Ohio App. LEXIS 3105 (8th Dist. July 12, 2001). Arthur noted that the scheduled visits between Mother and the children have not increased because of Mother continuing to use substances and her failure to complete case-plan services. As such, Arthur indicated that she continues to have concerns about whether Mother can safely parent the children.

{¶ 59} Arthur also stated that the children have remained in the same foster home for approximately the last two years. The children do well in the foster home and have bonded. The foster family has indicated that they would be willing to provide a permanent home for the children through adoption.

{¶ 60} In her report to the court, GAL Ernst provided that in the past, the children have witnessed Mother and J.P. yelling and fighting with each other. The children had also observed Mother when she was under the influence of drugs.

{¶ 61} In this case, the juvenile court found that this factor weighed in favor of permanent custody.

## R.C. 2151.414(D)(1)(b) Factor

{¶ 62} The second factor set forth in R.C. 2151.414(D)(1)(b) requires the juvenile court to consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child[.]" The juvenile court noted that "[i]n an In-Camera interview, the children expressed a wish to be reunified, but their GAL recommends permanent custody as being in their best interest."

{¶ 63} At the permanent custody hearing, Arthur testified that while the children have expressed a desire to be reunified with Mother, the children are starting to become discouraged and they are beginning to realize that Mother is not able to parent them in the future.

{¶ 64} In her report, GAL Ernst noted that the children have lived in their current placement for two years where they have felt safe and cared for. And the children are "happily" involved in a number of extracurricular activities.

{¶ 65} Here, the juvenile court found that this fact weighed heavily in favor of permanent custody.

## R.C. 2151.414(D)(1)(c) Factor

{¶ 66} The third factor set forth in R.C. 2151.414(D)(1)(c) requires the juvenile court to consider

> [t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or

private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state[.]

The juvenile court found that this factor weighed heavily in favor of permanent custody.

{¶ 67} Mother does not dispute the juvenile court's finding on this factor. Here, the children were removed from Mother's custody in June 2023 and have been in custody of the agency since that time.

## R.C. 2151.414(D)(1)(d) Factor

{¶ 68} The fourth factor set forth in R.C. 2151.414(D)(1)(d) requires the juvenile court to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" The juvenile court found that this factor weighed heavily in favor of permanent custody.

{¶ 69} As discussed in the first prong of the analysis, the juvenile court found that the children "cannot be placed with either of the child[ren's] parents within a reasonable time or should not be placed with the child[ren's] parents." Such a finding "precludes the court from considering returning the child[ren] to Mother's custody." *In re T.S.,* 2024-Ohio-827, ¶ 61 (8th Dist.), citing *In re E.J.,* 2023-Ohio-1376, ¶ 47 (8th Dist.). Thus, the trial court's finding precludes the court from determining that the children could be returned to Mother.

## R.C. 2151.414(D)(1)(e) Factor

**{¶ 70}** The fifth factor set forth in R.C. 2151.414(D)(1)(e) requires the juvenile court to consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." The juvenile court determined that this factor was not applicable. Mother does not challenge the juvenile court's decision on this factor.

**{¶ 71}** In determining that permanent custody to the agency was in the best interests of the children, the juvenile court's judgment entry expressly indicates that it considered all relevant factors set forth in R.C. 2151.414(D)(1). After a thorough review of the record, we find that the evidence was sufficient to support the juvenile court's determination that permanent custody to the agency is in the best interests of the children. Nor was the court's decision against the manifest weight of the evidence.

**{¶ 72}** Mother's sole assignment of error is overruled. The judgment of the juvenile court granting permanent custody of the children to the agency is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

MARY J. BOYLE, J., and
ANITA LASTER MAYS, J., CONCUR