[Cite as *In re T.S.*, 2024-Ohio-827.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE T.S.                          :

                                    :          No. 113127

A Minor Child                       :

                                    :

[Appeal by Mother]                  :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 7, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD23903162

---

### *Appearances:*

The Law Office of Victor O. Chukwudelunzu, LLC, and
Victor O. Chukwudelunzu, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

MARY EILEEN KILBANE, J.:

{¶ 1} Appellant ("Mother") appeals from the juvenile court's order that terminated her parental rights and granted permanent custody of her minor child, T.S. (d.o.b. 7/13/2013), to the Cuyahoga County Division of Children and Family

Services ("the agency" or "CCDCFS"). The child's father, A.D. ("Father"), is deceased. For the following reasons, we affirm the juvenile court's judgment.

**Factual and Procedural History**

{¶ 2} Three juvenile cases have been filed regarding the custody of T.S.: Cuyahoga J.C. No. AD17906350 ("2017 case"), Cuyahoga J.C. No. AD20905651 ("2020 case"), and Cuyahoga J.C. No. AD23903162 ("2023 case").

**2017 case**

{¶ 3} On April 20, 2017, the agency filed a complaint for neglect and dependency and temporary custody of T.S. The complaint alleged Mother had a substance abuse problem, specifically cocaine, that interfered with her ability to provide appropriate and adequate care for the child. The complaint alleged Mother did not have stable and appropriate housing for T.S., and Mother left the child for extended periods of time with relatives. The complaint alleged Mother lacked appropriate judgment and parenting skills necessary to provide adequate care for T.S. At the time the complaint was filed, T.S.'s father was incarcerated and unable to care for the child.

{¶ 4} On May 4, 2017, a case plan for T.S. and Mother was filed with the court. The case plan indicated that when sober, Mother was a loving and caring mother, and she shared a close bond with T.S. To address various concerns, Mother was referred for a drug and alcohol assessment and parenting classes and instructed to obtain and maintain stable, safe, and appropriate housing for T.S. and herself. The permanency plan was reunification of T.S. and Mother.

{¶ 5} On July 11, 2017, the complaint was amended to reflect Mother resided in a treatment center that did not permit T.S. to live with her. The amended complaint also stated Mother needed to engage in a parenting program and follow all recommendations. On July 27, 2017, the trial court adjudicated T.S. neglected and dependent; committed T.S. to the temporary custody of the agency; and placed T.S. with a relative.

{¶ 6} On May 17, 2018, the trial court extended temporary custody of T.S. to the agency until October 20, 2018. On October 26, 2018, the trial court found that Mother made significant progress on her case plan as evidenced by completion of substance abuse treatment, parenting education, and mental health services as well as Mother's establishing housing. The trial court terminated temporary custody to the agency and committed T.S. to the legal custody of Mother.

**2020 case**

{¶ 7} On June 29, 2020, the agency filed a complaint for neglect and temporary custody of T.S. The complaint alleged that on or about June 26, 2020, Mother left T.S. home alone without an appropriate caregiver. Mother allegedly did not return until one day later when the police became involved. Father was incarcerated and was set to be released in August 2022. The magistrate granted predispositional temporary custody to the agency.

{¶ 8} On August 27, 2020, the agency filed a voluntary dismissal. On September 15, 2020, the trial court dismissed the agency's complaint with prejudice,

and the court terminated its prior order committing the child to the predispositional custody of the agency.

**2023 case**

{¶ 9} The instant appeal arises from the 2023 case. On March 15, 2023, the agency filed a complaint for neglect and dependency and permanent custody of T.S. to the agency. The complaint alleged Mother had unaddressed mental health issues that affected her ability to provide appropriate care for T.S. The complaint alleged that on March 13, 2023, Mother experienced a mental health crisis during which she threatened to harm herself and T.S., and Mother was hospitalized at the time of the filing of the complaint. The complaint additionally alleged Mother had a substance abuse issue, particularly with alcohol and marijuana, that affects her ability to provide appropriate care for T.S. The complaint alleged Mother did not have appropriate or independent housing. The complaint also alleged T.S. was previously adjudicated neglected and dependent and committed to the agency's temporary custody in part due to Mother's substance use and lack of housing. The complaint further alleged that reasonable efforts were made by the agency to prevent the removal of T.S. from the home and removal was in the best interest of the child.

{¶ 10} On the same date, the agency filed a motion for predispositional temporary custody. The trial court found a suitable relative was not available to act as temporary custodian of T.S. The trial court noted that community collaborative services and counseling for Mother and T.S. were previously provided but the family

failed to benefit from the services. The trial court committed T.S. to the emergency temporary care and custody of the agency.

{¶ 11} On March 16, 2023, the trial court appointed Michael Murphy as Guardian Ad Litem ("GAL") for T.S. On May 2, 2023, the trial court conducted an arraignment hearing on the complaint for permanent custody. Mother was present at the hearing, and she denied the allegations in the complaint. The trial court continued its prior order for emergency temporary custody to the agency. T.S. was then residing with his maternal aunt, Toi Jacobs ("Jacobs"), and Mother was permitted supervised visitation.

{¶ 12} On June 8, 2023, the court conducted an adjudicatory hearing that was attended by Mother, her counsel, and the GAL. The trial court heard testimony from Anthony Rentas ("Rentas"), a child protection specialist with the agency.

{¶ 13} Rentas testified that the agency was contacted in March 2023, when Mother stated several times at T.S.'s childcare that she was going to kill herself as well as T.S. The police intervened, and Mother was transported to Marymount Hospital for mental health concerns. Rentas went to the hospital and was informed by the hospital social worker that Mother tested positive for alcohol and marijuana. Rentas also spoke directly with Mother. Mother admitted that she was intoxicated but denied any drug use. Mother told Rentas that she remembered saying that she wanted to harm herself and T.S. Mother also told Rentas that she was "very overwhelmed with life." Tr. 10. Mother was being evicted from her apartment, and she was concerned about her housing situation. Mother discussed trauma she had

experienced, including being an eyewitness to the fatal shooting of T.S.'s Father by Mother's paramour. Mother stated she was supposed to start a new job that day, and she was concerned about being terminated. Mother verbalized her wish to regain custody of T.S., but she did not know how she would provide for T.S. Mother told Rentas she was comfortable with T.S.'s placement with his aunt.

{¶ 14} Rentas testified that he was not aware of Mother previously harming T.S. When Rentas spoke with T.S. about the events of March 2023, the child indicated he had been sent to another room; T.S. did not indicate he felt threatened or fearful of Mother. T.S. informed Rentas that he observed Mother drink four to five times a week and stated, "[S]ometimes when she drinks she acts weird * * * ." Tr. 15.

{¶ 15} Rentas observed Mother and T.S. during supervised visitation and stated, "[T]hey interacted okay." Tr. 13. Rentas testified that Mother and T.S. were previously involved with the agency due to concerns of substance abuse, housing, and lack of parental supervision. Rentas testified that Mother participated in the offered services but based upon the incident in March 2023, Mother did not experience long-term benefits.

{¶ 16} Following Rentas's testimony, the trial court found that the agency made reasonable efforts to prevent removal of T.S. from the home or to make it possible for the child to return to Mother's care and custody. The trial court noted that Mother and T.S. were previously subject to the agency's care and subject to a case plan. The court further noted that Mother did not show full compliance with

all of the recommended classes. The trial court found the complaint proven by clear and convincing evidence and adjudicated T.S. neglected and dependent.

{¶ 17} On July 25, 2023, the trial court held a dispositional hearing. Mother and her counsel were present for the hearing as well as the GAL; agency child protection specialist, Shannon Nash ("Nash"); and counsel for the agency. The trial court granted the agency's oral motion to incorporate the testimony from the June 8, 2023 adjudication hearing.

{¶ 18} Nash testified that she was assigned to the 2023 case on June 7, 2023 when T.S. was ten years old. Nash testified that Mother and T.S. first became involved with the agency in 2013, when T.S. was a few months old. At that time, there was a report of domestic violence between Mother and Father and Mother taking T.S. outside into the cold weather. No court involvement resulted from the 2013 incident.

{¶ 19} Nash testified about the 2017 case and stated that the concerns were Mother's parenting, substance abuse, and leaving T.S. unsupervised. Nash testified that T.S. was adjudicated neglected and dependent, and the trial court committed T.S. to the temporary custody of the agency. Mother engaged in services for substance abuse and parenting, and in October 2018, she was awarded custody of T.S.

{¶ 20} Nash testified that in the June 2020 case, the agency was granted emergency temporary custody, but T.S. was returned to Mother's custody three months later.

{¶ 21} Nash testified that T.S. returned to the agency's custody in March 2023, when the agency received notice that Mother threatened to kill herself and T.S. The agency placed T.S. with his maternal aunt, Jacobs. Following the March 2023 incident, Mother was admitted to Marymount Hospital for psychiatric care. After Mother's release from the hospital, the agency created a case plan with objectives for housing, parenting, mental health, and substance abuse. The agency referred Mother to parenting services and substance abuse services due to testing positive for alcohol.

{¶ 22} Nash testified that Mother began intensive outpatient treatment ("IOP") for her substance abuse issues and received parenting services in April or May 2023 at New Visions. Mother had inconsistent attendance at the substance abuse program and was unsuccessfully discharged in June 2023 from both programs. While enrolled in the IOP program, Mother submitted three drug screens, one of which was positive for alcohol.

{¶ 23} Nash testified that prior to the 2023 case, Mother had engaged in substance abuse treatment six times, and successfully completed one program in 2017. As of the dispositional hearing in July 2023, Nash testified that she was not aware of Mother's involvement in a 12-step meeting program; Mother did not have verified sobriety with the agency; and Mother's lack of engagement in a substance abuse program concerned Nash since she "expected Mother to be a bit more involved." Tr. 20. Nash testified that due to Mother's history of substance abuse and her unsuccessful participation in the New Visions program, Nash was not

confident that Mother would complete any such program at this time or maintain sobriety for an extended period of time. Further, Nash did not believe Mother could demonstrate sobriety within a reasonable time.

{¶ 24} Nash testified that she did not know the status of Mother's receipt of mental health services although New Visions could have provided such services. Nash further testified that she had not had much contact with Mother; she did not know if Mother was compliant with mental health services, nor did she know where Mother was receiving mental health services.

{¶ 25} Nash testified that Mother was living under a pending eviction when the 2023 case was referred to the agency, and Mother reportedly then moved to a hotel. Mother did not provide the agency with her current address, and without that information, the agency could not provide Mother with housing resources.

{¶ 26} Nash testified that her engagement with Mother has been inconsistent; Mother typically does not respond to Nash's attempts at contact. Nash testified that Mother was employed. Nash also testified that the case file does not reflect a stable work history by Mother. Nash testified that in her opinion Mother could not currently meet T.S.'s basic needs nor could she do so in a reasonable time.

{¶ 27} Nash further testified that there is not a consistent visitation schedule. Nash usually contacts Mother to coordinate the next visit with T.S., but Mother does not always respond to Nash. Nash observed only one visitation between Mother and T.S. Nash testified that there is a bond between Mother and T.S., and Mother exhibited good parenting skills with T.S. Additional visitations did

not go forward because Mother did not show up, Mother was involved in a car accident, and T.S. was out of town.

{¶ 28} Nash stated that T.S. resides with Jacobs, with whom he has an engaging, loving, and playful relationship. Nash stated that Jacobs provides T.S.'s basic needs, and the aunt has indicated she is interested in providing permanent custody to T.S.

{¶ 29} Nash testified that T.S. receives trauma-focused therapy from the agency because he saw his Father fatally shot. Nash testified a consistent caregiver will help T.S. address his mental health, and she does not believe Mother has demonstrated the ability to do so. Nash further testified that T.S. has not had a stable environment with his Mother over the past ten years.

{¶ 30} Jacobs also testified at the dispositional hearing. In addition to the Mother's difficulties as demonstrated in the 2017 and 2020 cases, Jacobs testified that in September 2022, Mother had an alcohol-related incident when she punched several glass windows, required resuscitation, and was hospitalized. Jacobs testified that she recommended Mother seek assistance from either a drug and/or alcohol program, but Mother did not do so.

{¶ 31} Jacobs testified that Mother's prior engagement with substance abuse programs provided only short-term assistance. Jacobs testified that she thought Mother used alcohol and drugs to relax and escape from the stress in her life. Jacobs testified that over the past several years, family members have discussed with Mother their concern about her self-care and being present for T.S.

{¶ 32} Jacobs testified that in February 2023, she received a phone call from T.S. who needed Jacobs's help because Mother threatened to harm herself. Jacobs and other family members went to the home of T.S. and Mother where they found Mother loud, aggressive, and violent and under the influence of drugs or alcohol. The police were called to the scene, and Mother was transported to Marymount Hospital for mental health services. T.S. stayed in Jacobs's care for two to three weeks. Jacobs testified that approximately two weeks passed between the time T.S. returned to Mother's care and the March 2023 daycare incident that resulted in agency involvement.

{¶ 33} Jacobs stated that T.S. was very quiet following the daycare incident, but since entering Jacobs's care and custody in March 2023, he "laughs a lot more," which she attributes to a stable environment and a consistent schedule. Tr. 52.

{¶ 34} Jacobs testified that due to Mother's mental health and/or substance abuse issues, Mother does not maintain a structured environment for T.S. Jacobs testified that Mother "normally tries to keep a job" but maintaining employment is sometimes problematic for her. Tr. 54. Jacobs testified that Mother has moved residences a lot over the past ten years, and those changes are often not at Mother's own choice.

{¶ 35} Jacobs testified that she believes Mother is currently employed. Jacobs testified that Mother has provided for T.S. financially, but she also gets assistance from friends and family.

{¶ 36} Jacobs testified that Mother and T.S. care for one another, and T.S. enjoys spending time with Mother. Jacobs testified that Mother was better able to care for T.S. prior to his father's murder. Jacobs testified that she does not believe Mother's situation will stabilize within six months. Jacobs stated she is willing to provide T.S. with a permanent home. Jacobs testified that because T.S. has "been through a lot" he needs a stable environment so that he understands "he has the ability to grow and do whatever he wants to do, and that certain lifestyles, they're not the only option." Tr. 62. Jacobs testified that Mother has provided such stability minimally throughout T.S.'s life.

{¶ 37} The GAL also testified at the dispositional hearing. The GAL testified that he has known T.S. since the 2017 case. The GAL was present at the visitation scheduled the week prior to the dispositional hearing. The GAL confirmed that Nash attempted to contact Mother, who did not appear for the scheduled visitation, but was unable to reach Mother. The GAL testified that Mother was living in a hotel.

{¶ 38} The GAL stated T.S. is an intelligent, stable ten-year old who performs well academically. The GAL testified that T.S. is very familiar with Jacobs and her husband and their home, and he is not a disciplinary problem for them. The GAL attributed a portion of T.S.'s academic record and good nature to Mother's parenting. The GAL testified that T.S. should receive counseling because he witnessed the fatal shooting of his Father.

{¶ 39} The GAL testified that the case plan objectives Mother completed in 2017 relate to the same problems alleged in the current case. The GAL stated there

is a change in his interactions with Mother in comparison to when he dealt with her on the 2017 case. The GAL testified that Mother is less communicative now and has contacted him only once since the onset of the 2023 case. The GAL testified that Mother does not provide a stable environment due to her continuous moves to new apartments and her substance abuse issues:

> Considering all the issues [M]other has had, I believe it's not in his best interest to reside in her care and custody, but I don't wish to discount she's tried to provide for her son and she's had appropriate housing in the past, but the problem is she's not been able to keep her housing long term, nor has she been able to stay sober long term.

Tr. 68. The GAL testified it was in T.S.'s best interest to grant permanent custody to the agency because of Mother's problems with substance abuse and housing.

{¶ 40} The GAL also provided a written report that noted Mother's mental health crises in March 2023, and her reported use of alcohol to excess. In July 2023, Mother self-reported to the GAL that she lost her apartment and resided in a hotel. The GAL noted Mother has a history of eviction filings. The GAL also noted Mother's mental health and substance abuse issues partially stem from her witnessing the murder of T.S.'s father. T.S. informed the GAL his indifference about being placed with his Mother or Jacobs since he would still attend the same school and maintain the same activities regardless of with whom he lived. T.S. informed the GAL that his aunt and uncle encouraged him to work hard and achieve good grades. In his report, the GAL concluded that even though Mother has had appropriate housing and provided for T.S. in the past, her unresolved substance abuse, mental health issues, and lack of housing support a grant of permanent custody to the agency.

{¶ 41} Following the dispositional hearing, the trial court issued a judgment entry on July 27, 2023, that found by clear and convincing evidence that the agency provided relevant services — specifically mental health, substance abuse, and parenting classes as well as housing services, to Mother and trauma-focused therapy to T.S. Pursuant to R.C. 2151.414(B)(1)(a), the trial court found that T.S. cannot or should not be placed with Mother within a reasonable period of time because (1) Mother continuously and repeatedly failed to substantially remedy the conditions causing T.S.'s placement with the agency, and (2) Mother demonstrated a lack of commitment toward T.S. by failing to regularly support, visit, or communicate with the child, or by other actions showing an unwillingness to provide an adequate permanent home for T.S. The trial court found that it was in the best interest of T.S. to be placed in the permanent custody of the agency; terminated the parental rights of Mother; and approved a permanency plan for adoption.

{¶ 42} On August 28, 2023, Mother filed a timely appeal, presenting three assignments of error for our review:

> **Assignment of Error I:** The juvenile court's ruling granting permanent custody of T.S. to CCDCFS was against the manifest weight of evidence.
>
> **Assignment of Error II:** The juvenile court's ruling granting permanent custody of T.S. to CCDCFS was in error, because appellee did not show that it made "reasonable efforts" to reunite the family pursuant to R.C. 2151.419.
>
> **Assignment of Error III:** The juvenile court's ruling granting permanent custody of T.S. to CCDCFS and terminating Mother's parental rights violated state law and Mother's right to due process as

guaranteed by the Fourteenth Amendment of the United States Constitution and Section 16, Article I of the Ohio Constitution.

## Legal Analysis

### Manifest Weight of the Evidence

{¶ 43} In her first assignment of error, Mother argues that the trial court's grant of permanent custody of T.S. to the agency was against the manifest weight of the evidence.

{¶ 44} A parent has a fundamental interest in the care and custody of his child. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 20. However, parental rights are not absolute: "'The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). "By terminating parental rights, the goal is to create 'a more stable life' for dependent children and to 'facilitate adoption to foster permanency for children.'" *In re R.G.*, 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897, ¶ 21, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

{¶ 45} When reviewing a custody case for manifest weight of the evidence,

the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of

the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 14.

{¶ 46} On a motion for permanent custody, a juvenile court must satisfy the two-prong test set forth in R.C. 2151.414 before it can terminate parental rights and grant permanent custody to the agency. The juvenile court must find by clear and convincing evidence that any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) apply and that it is in the best interest of the child to grant permanent custody to the agency. *In re R.G.*, 8th Dist. Cuyahoga No. 108537, 2020-Ohio-3032, ¶ 19-20.

{¶ 47} Clear and convincing evidence has been defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

## A. R.C. 2151.414(B)(1) Findings

{¶ 48} The juvenile court must find by clear and convincing evidence that one of the following five conditions applies under R.C. 2151.414(B)(1):

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children service agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1).

{¶ 49} Here, the juvenile court addressed the first prong of the statutory test by finding that T.S. could not or should not be placed with Mother within a

reasonable time pursuant to R.C. 2151.414(B)(1)(a). To support a finding that a child cannot or should not be placed with a parent within a reasonable time, the trial court looks to R.C. 2151.414(E)'s 15 enumerated factors. The trial court in the instant case found the presence of (E)(1) and (E)(4) factors supported its decision. R.C. 2151.414(E) states, in pertinent part:

> (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

> > (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> > (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 50} Mother's arguments do not address the first prong of the statutory test — whether T.S. could not or should not be placed with Mother within a

reasonable time — but only discuss the best interest of the child test. We note that the record supports a finding that T.S. could not or should not have been placed with Mother within a reasonable time. The record demonstrates that in 2023 the agency created a case plan for Mother that addressed substance abuse, mental health, housing, and employment. Mother was referred to New Visions where she could obtain substance abuse, mental health, and parenting services.[1] Mother engaged in substance abuse and parenting services but was unsuccessfully discharged from the programs. The agency did not know the status of Mother's mental health services, although Mother could have pursued such services at New Visions. Mother failed to provide her current address to the agency so the agency was unable to assist her with housing. Mother failed to remedy the problems that initially caused the removal of T.S.

{¶ 51} Additionally, the record demonstrated that Mother's actions showed her unwillingness to provide an adequate permanent home for T.S. *See* R.C. 2151.414(E)(4). Mother's 2017 case plan addressed substance abuse, parenting skills, and lack of housing. While Mother received services and regained custody of T.S. in 2018, those services did not provide a long-term benefit as demonstrated by the 2023 case plan that again addressed substance abuse and lack of housing. The testimony of Rentas, Nash, and Jacobs demonstrated that Mother's substance abuse

---

[1] The 2023 case plan refers Mother for substance abuse, mental health, housing, and employment services. Nash testified Mother was also referred for parenting services. It is unclear whether the parenting services were considered in combination with the substance abuse services or if Nash misspoke when she stated Mother was subject to parenting services.

and housing issues continued in 2022 and 2023. There was sufficient evidence for the trial court to find that Mother did not benefit from the services in 2017 and 2023, and the trial court should not or could not place T.S. with Mother.

{¶ 52} We note that not all cases where the agency intervenes a second time, or more, on behalf of a child automatically demonstrate a parent's failure to substantially remedy the conditions that caused the child to be placed outside of his or her home or an unwillingness to provide an adequate permanent home. But here, where the testimony demonstrated ongoing substance abuse and housing concerns that resulted in T.S.'s removal from Mother's care in 2017, 2020, 2022, February 2023, and March 2023, we find that the record supports the trial court's findings under R.C. 2151.414(E)(1) and (4).

## B. Best Interest of the Child Findings

{¶ 53} Once the trial court found that one of the enumerated R.C. 2151.414(B)(1) factors was present, the court then conducted an analysis of the child's best interest. The juvenile court had to find by clear and convincing evidence that it was in the child's best interest to grant permanent custody to the agency. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, at ¶ 36. On appeal, the court reviews a trial court's best interest analysis for an abuse of discretion. *Id.* at ¶ 37. The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983); *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187

N.E.3d 463. Such broad discretion applies in a permanent custody hearing. *In re A.W.*, 8th Dist. Cuyahoga No. 109239, 2020-Ohio-3373, ¶ 25.

{¶ 54} Mother argues that the record does not demonstrate permanent placement of T.S. with the agency was in his best interest. Specifically, Mother argues that she and T.S. have a close bond and their visits have been appropriate; T.S. indicated to Jacobs that he likes being with Mother; T.S. could experience a legally secure placement with Mother; Mother has housing; and Mother is employed. The agency contends the evidence demonstrates it is in T.S.'s best interest to be permanently placed with the agency.

{¶ 55} To determine the best interest of a child, the trial court considers all relevant factors including, but not limited to, those listed in R.C. 2151.414(D)(1)(a)-(e):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

Not one factor listed in R.C. 2151.414(D)(1) is given greater weight than any other factor and only one of the statutory factors needs to be found in favor of the award of permanent custody. *In re L.W.* at ¶ 39, quoting *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. The focus of a best interest determination is the child, not the parent. *In re R.G.*, 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897, at ¶ 28, citing *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 59; *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994).

{¶ 56} The record reflects that T.S. often resided with a family relative from 2017 through 2023 due to Mother's inability to care for the child. T.S. lived with Jacobs for several weeks in February 2023, and the agency placed the child with Jacobs again in March 2023. Nash and the GAL testified about a positive relationship between T.S. and Jacobs. Jacobs testified that the child opened up and laughed more frequently under her care. Jacobs also testified that she and her husband are interested in adopting T.S.

{¶ 57} Nash, Jacobs, and the GAL also testified that Mother and T.S. shared a bond. The GAL testified that T.S. informed him that it would not matter to T.S. if he resided with Mother or Jacobs since he would not change schools should he live

with Jacobs rather than Mother. The GAL recommended that the trial court grant permanent custody to the agency because Mother has unresolved substance abuse and mental health issues; Mother is unable to maintain housing on a long-term basis and was living in a hotel at the time of the dispositional hearing; and T.S. requires a stable environment and the receipt of therapy following the witnessing of his Father's fatal shooting.

{¶ 58} We recognize that Mother has a bond with T.S., and the testimony indicated Mother raised an intelligent, respectful child who earns good grades and appears happy. Yet, the bond between the two is not sufficient to establish that it was in T.S.'s best interest to be placed with Mother. *See In re Holyak*, 8th Dist. Cuyahoga No. 78890, 2001 Ohio App. LEXIS 3105, 10 (July 12, 2001) ("But having a good relationship with the children is not enough.").

{¶ 59} "A child's best interests require permanency and a safe and secure environment." *In re Holyak* at 10. T.S. deserves a legally secure, permanent placement where he can be safe, thrive, and have all his needs met. Such a placement could not be accomplished with Mother. Mother struggled with mental health, substance abuse, and housing issues; did not obtain long-term benefits from previously provided agency referrals; and was unwilling to participate in the referral services in 2023.

{¶ 60} Mother contends that she could provide a secure placement for T.S. because she was successfully discharged from the hospital following the March 2023 mental health crisis; Mother engages in trauma therapy; Mother is employed; and

Mother has housing. The evidence presented by Rentas, Nash, Jacobs, and the GAL did not support Mother's contentions. No testimony was provided to indicate Mother engaged in trauma therapy. Nash did not personally inspect Mother's home but Nash testified that Mother failed to provide the agency with her home address, and the GAL testified Mother resided in a hotel. Nash did not verify details of Mother's employment but the terms of Mother's employment, alone, would not establish that she could provide a secure home for T.S. The evidence demonstrated Mother's ongoing challenges with substance abuse and housing that supported the trial court's decision to grant permanent custody to the agency.

{¶ 61} Further, a trial court's finding that it cannot or should not place a child with a parent precludes the court from considering returning the child to Mother's custody. *In re E.J.*, 8th Dist. Cuyahoga No. 112209, 2023-Ohio-1376, ¶ 47. *See In re Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379, 20-21 (July 27, 2000) (After finding that a child cannot or should not be placed with a parent, the trial court is required by statute to place the child with someone other than the parent.). Thus, the trial court's initial finding that it could not or should not place T.S. with Mother precluded return of the child to Mother's care and custody.

{¶ 62} We find that the record provided the trial court with clear and convincing evidence to find permanent custody to the agency, rather than Mother, was in T.S.'s best interest.

{¶ 63} The record demonstrates that the juvenile court complied with the statutory requirements of R.C. 2151.414(B)(1) and 2151.414(D) when it determined (1) the evidence showed that T.S. could not or should not be placed with Mother within a reasonable time and (2) it was in T.S.'s best interest to be placed in the permanent custody of the agency.

{¶ 64} Mother's first assignment of error is overruled.

**Reasonable Efforts**

{¶ 65} In her second assignment of error, Mother argues that the agency did not demonstrate it made reasonable efforts to make it possible for T.S. to safely return to Mother's home. The agency argues that throughout the pendency of the permanent custody proceedings the trial court made findings that reasonable efforts were made.

{¶ 66} A public children's services agency has a duty to make reasonable efforts to preserve or reunify a family unit, including preparing and maintaining a case plan to bring a child back home. R.C. 2151.412. However, where the agency has filed a complaint for permanent custody under R.C. 2151.353(A)(4), a reasonable efforts determination is not required at the permanent custody hearing when the record demonstrates a reasonable-efforts determination was already made during the proceedings. *In re A.F.*, 8th Dist. Cuyahoga No. 112918, 2023-Ohio-4423, ¶ 23, citing *In re N.R.*, 8th Dist. Cuyahoga No. 110144, 2021-Ohio-1589, ¶ 38, citing *In re A.R.*, 8th Dist. Cuyahoga No. 109482, 2020-Ohio-5005, ¶ 32.

{¶ 67} On June 8, 2023, the trial court conducted an adjudication hearing on the agency's complaint for neglect, dependency, and permanent custody. The trial court heard and accepted evidence and found the agency made reasonable efforts — through the referral of Mother to mental health, substance abuse, and housing services — to finalize the permanency plan for T.S. and to make it possible for T.S. to safely return to Mother's care and custody. Thus, the juvenile court was not required to make an additional reasonable-efforts determination at the permanent custody hearing.

{¶ 68} Although not required to do so, the juvenile court again found at the permanent custody hearing that reasonable efforts were made to return T.S. to Mother's care and custody. The trial court stated in its July 27, 2023 judgment entry that the agency provided mental health, substance abuse, parenting, and housing services to Mother and trauma-focused therapy to T.S.

{¶ 69} Mother asserts that she notified Nash that she had stable housing and employment and Nash did not make reasonable efforts to visit her home, make a referral for housing services, or confirm Mother's employment. Mother also argues that the agency knew she received trauma therapy following the death of T.S.'s father but did not use reasonable efforts to ascertain her progress with mental health services. Mother argues the agency did not use reasonable efforts to locate a relative to serve as a legal custodian for T.S. and facilitate an application for legal custody.

{¶ 70} While R.C. 2151.419(A) does not state the evidentiary standard of proof required for the agency to demonstrate reasonable efforts, this court has

previously applied a clear and convincing evidence standard. *In re A.F.*, 8th Dist. Cuyahoga No. 112918, 2023-Ohio-4423, at ¶ 26. *See, e.g., In re L.G.*, 8th Dist. Cuyahoga No. 110789, 2022-Ohio-529, ¶ 55. We follow this court's precedent and apply the clear and convincing evidence standard to this issue.

{¶ 71} "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. "In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification." *In re L.G.* at ¶ 60, citing *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 76, citing Bean, *Reasonable Efforts: What State Courts Think*, 36 U.Tol.L.Rev. 321, 366 (2005).

> When considering whether the agency made reasonable efforts to prevent the continued removal, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute. *In re Davidson-Rush*, 5th Dist. Stark No. 2006 CA 00121, 2006-Ohio-4873, ¶ 50. "'Reasonable efforts' does not mean all available efforts." *In re Lewis*, 4th Dist. Athens No. 03CA12, 2003-Ohio-5262, ¶ 16. "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

*In re J.B.*, 8th Dist. Cuyahoga No. 109039, 2020-Ohio-3675, ¶ 21.

{¶ 72} The record demonstrates in 2017 the agency referred Mother for substance abuse, parenting, and housing services that Mother completed to regain custody of T.S. In 2023, the agency again referred Mother for substance abuse and

parenting services; Mother initiated the services but was unsuccessfully discharged from them. Mother did not provide her current address to the agency and, therefore, the agency was unable to facilitate a housing referral. Although Mother's 2023 case plan included mental health services, Nash did not provide such a referral and Nash was unaware of Mother's compliance with such services. Mental health services were available at New Visions, the same facility where Mother sought substance abuse and parenting services. And while we prefer to see the agency provide referrals as outlined in the case plan, compliance with a case plan does not establish that a parent sufficiently remedied the conditions that caused the child to be removed from the parent's custody. *In re J.H.*, 8th Dist. Cuyahoga No. 105078, 2017-Ohio-7070, ¶ 46. The testimony of Rentas, Nash, Jacobs, and the GAL established reasonable efforts were made.

{¶ 73} As to Mother's allegation that the agency should have pursued legal custody of T.S. to a relative, the court was under no obligation to do so nor has Mother presented any case law in support of her argument. Nash testified that the agency did not pursue legal custody because Jacobs was still deciding if she wanted permanent custody or legal custody. A trial court cannot order legal custody to a caregiver without the caregiver's cooperation. R.C. 2151.353(A)(3).

{¶ 74} The record clearly and convincingly shows that the agency made reasonable efforts to refer Mother for the services needed to effectuate reunification with T.S.

{¶ 75} Mother's second assignment of error is overruled.

**Due Process Rights**

{¶ 76} In her third assignment of error, Mother argues that the trial court's order of permanent custody to the agency violated her due process rights. Specifically, Mother argues that the agency did not provide evidence or testimony to support its allegations that Mother tested positive for alcohol and marijuana; did not verify Mother's employment or housing status; did not contact Mother's mental health services provider; and conducted a dispositional hearing too quickly without first providing Mother a referral for services or the opportunity to participate in case plan services.

{¶ 77} To determine whether due process was afforded in a permanent custody action, a court considers three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 18, quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

{¶ 78} The first factor is whether Mother has a significant private interest. In the context of a permanent custody proceeding, a parent is entitled to procedural due process of law because the right to raise one's child is a recognized, fundamental liberty interest deserving of such protection. *Fleming v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 8th Dist. Cuyahoga No. 63911, 1993 Ohio App. LEXIS

3648, 20-21 (July 22, 1993). We note that parental interests are subordinate to a child's interest in a permanent custody action. *In re Cunningham*, 59 Ohio St.2d 100, at 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App.1974). When preservation of the natural family unit is harmful to the child, the child's interest "becomes a permanent placement in a stable, secure, and nurturing home without undue delay." *In re B.C.* at ¶ 20.

{¶ 79} The second factor compares the risk of erroneous deprivation of the parent's interest under the current procedures and the probable value, if any, of additional or different procedural safeguards. *In re B.C.* at ¶ 21. Mother argues that the agency failed to (1) obtain a copy of the positive toxicology report, (2) verify her employment, (3) contact Mother's trauma counselor, (4) refer her for services, and (5) provide her an opportunity to participate in the case plan. While the agency did not obtain a toxicology report, the record demonstrates Mother's ongoing substance abuse issue. Case plans were prepared for Mother in 2017 and 2023; the agency provided referrals in 2017 and 2023; and Mother did not benefit from those services. Even without verification of Mother's employment or mental health services, the record presented sufficient evidence in support of the trial court's grant of permanent custody to the agency. In this unique set of circumstances, due to Mother's ongoing issues that spanned over five years; the agency's referral for services; and Mother's failure to benefit from the services long term or to successfully complete the 2023 substance abuse and housing services, we find that

the trial court's actions did not violate Mother's due process rights. Current procedures did not deprive Mother of her private interest.

{¶ 80} The third factor is the government's interest in minimizing fiscal and administrative costs and to promote the welfare of the child, T.S. The statutory protections utilized under R.C. Chapter 2151 ensure a parent subject to the termination of parental rights has the opportunity to fully participate in the proceedings with notice, representation, and the remedy of an appeal:

> Procedural safeguards already exist in parental-termination cases. R.C. Chapter 2151 contains the procedures for cases involving juveniles, including the award of permanent custody of a child away from the natural parents. R.C. 2151.01 requires courts to construe those provisions liberally in favor of retaining the family unit, "separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A). Division (B) further provides that the purpose of the statutes is also to "provide judicial procedures * * * in which the parties are assured of a fair hearing, and [****] their constitutional and other legal rights are recognized and enforced."
>
> R.C. 2151.414 sets forth the procedures that follow the filing of a motion for permanent custody, many of which are designed to protect the parent's interest in retaining the parent-child relationship.

*In re B.C.* at ¶ 25-26.

{¶ 81} Mother's due process rights were not violated and, therefore, we overrule her third assignment error.

{¶ 82} This matter does not represent an unwarranted, expedited request for permanent custody but is a case where the agency provided Mother multiple opportunities over ten years to correct the problems that led to T.S.'s removal from her care. The record shows the agency's involvement with T.S. and Mother

throughout T.S.'s life, starting in 2013 when T.S. was a few months old. The agency engaged with the parties again from April 2017 through October 2018, from June through August 2020, and from March 2023 until the trial court granted permanent custody in July 2023. Recognizing their strong bond, the agency attempted to reunify Mother and T.S. through the development of case plans and referrals, but Mother was unable to gain long-term benefits from the referred services.

{¶ 83} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MARY J. BOYLE, J., CONCUR