[Cite as *In re Ju.G.*, 2026-Ohio-2077.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| IN RE JU.G., ET AL. | : | |
| | | No. 115335 |
| Minor Children | : | |
| [Appeal by Mother, Z.G.] | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 4, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD23912123, AD23912124, AD23912125, and AD23912126

---

### *Appearances:*

Brittany Luarde, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

MICHAEL JOHN RYAN, J.:

{¶ 1} Z.G. ("Mother") appeals from the juvenile court's June 2025 judgments granting the motions of the Cuyahoga County Division of Children and Family Services (the "agency") to modify temporary custody of Mother's four

younger children to permanent custody.[1]  After a thorough review of the facts and pertinent law, this court affirms.

**Procedural and Factual Background**

{¶ 2}  The record demonstrates that Mother's native language is Spanish. The juvenile court afforded her a translator for the proceedings.

{¶ 3}  Mother was initially in a relationship with L.N.-M.,[2] and they had a daughter, Z.N.-G. ("Oldest Child" or "Older Daughter") born in September 2014. Oldest Daughter was not a subject of the juvenile court's decision in this case. Mother then had relationship with another man and had J.G. ("Younger Daughter") born in October 2016.  The agency could not confirm the father of the Younger Daughter, and he is not a party to these proceedings.

{¶ 4}  In 2019, Mother "fell crazy in love" with J.A., who moved in with Mother and her daughters about a month after she met him.  (Tr. 142, 265.)[3]  They had three sons: Jo.A. (Oldest Son) born August 2021, and twins, Je.A. ("Je") and Jos.A  ("Jo") born September 2022.

---

[1] Mother is the only appellant; the fathers have not appealed.

[2] L.N-M. was recently released from prison and is trying to restore the father-child relationship with Oldest Child with the plan of having custody of his daughter.  Oldest Child is not a subject of this appeal.

[3] Unless otherwise specified, references to the transcript are from the May 2025 hearings.

{¶ 5} In early January 2023, Older Daughter was removed from Mother's care after the child reported that J.A. was molesting her. J.A. was arrested on January 6, 2023, and indicted for three counts of rape.

{¶ 6} Mother did not believe Older Daughter and said she was lying. She indicated that J.A. could not have molested the girl because she never left J.A. alone with the children. (Tr. 143.) The agency returned Older Daughter to Mother in May 2023, pursuant to the case plan; Mother appeared to have believed the accusations. (1-17-24 tr. 60.)

{¶ 7} However, Mother later continued to deny that J.A. had molested Older Daughter. Mother accused Oldest Daughter of lying and of being jealous of the relationship Mother had with J.A. Mother told a sex abuse case worker that Older Daughter had recanted. (1-17-24 tr. 63.) Mother admitted under oath during the May 2025 hearings that she attempted to get Older Daughter diagnosed with schizophrenia to discredit her allegations. (Tr. 283, 291.) Similarly, when the agency confronted Mother with evidence that J.A.'s DNA was found in Older Daughter's panties, Mother said those were her underwear that Older Daughter took and wore. (Tr. 144.) Mother admitted under oath that she prioritized her relationship with J.A. over her children. (Tr. 283, 291.)

{¶ 8} The agency took emergency custody of all five children on October 24, 2023. The agency was concerned about Mother's ability to protect her children.

{¶ 9} Following the removal of the children, the agency developed a case plan for Mother to promote the permanency plan of reunification. The plan

included services to address Mother's issues with mental health, housing, parenting education, and the provision of basic needs. The plan further included family counseling for Mother and Older Daughter and mental-health services for all of the children.

{¶ 10} When the agency took the children, the family was living in maternal grandmother's two-room apartment and there was very little room for the children to walk and play. All the children had had lice for months; Mother's home-remedies were ineffective. The three boys were sleeping in pack-and-plays, not beds, and they were still being bottle-fed. (1-17-24 tr. 104-105; Guardian Ad Litem's ("GAL") 1-17-24 report.) Oldest Son, at two-years old, had developmental delays and poor motor and verbal skills. He needed multiple referrals for sleep, hearing, tonsils, other ear nose and throat problems, and eye issues. (1017-24 tr. 106-107.) The twins could not walk on their own and did not know how to eat other than to keep their mouths open, nor could they say any words (GAL's 1-17-24 report.) Younger Daughter had low vision and reading difficulties. On January 17, 2024, the juvenile court found Older Daughter to be abused and the other children dependent and granted temporary custody to the agency.

{¶ 11} On October 24, 2023, the grand jury issued a superseding indictment against J.A. for four counts of rape against Older Daughter. On December 19, 2023, J.A. pled guilty to two counts of rape and one count of gross sexual imposition. In February 2024, the trial court sentenced him to 21 to 26.5 years in prison. Nevertheless, Mother persisted in her relationship with J.A. From February 25,

2024, through August 8, 2024, Mother accepted 277 telephone calls from J.A. in prison, approximately 90 of which lasted almost a half-hour. (Agency's exhibit No. 2.) When the agency confronted her with the calls, she initially stated she either did not answer them or hung-up immediately. When the agency revealed that it could get a log of the calls, Mother changed her phone number, and it appeared that the phone calls from J.A. stopped.

{¶ 12} At approximately the same time Mother apparently terminated her relationship with J.A., she began a relationship with another man, D.O.B., a native of the Dominican Republic, who entered the United States on a baseball visa. (Tr. 192.) After a short courtship, Mother married D.O.B. on October 26, 2024. (Tr. 259, Mother's Exhibit I.) The agency learned of this development in February 2025 when Mother told the children during a visitation that she would like to bring her boyfriend to the next visitation. (Tr. 171-172.) After the visitation was over, the Younger Daughter told her foster mother that she "did not want another man touching her private parts." When the agency told Mother that it suspected J.A. had also molested the Younger Daughter, Mother denied that it happened and indicated that was not much of a concern. (Tr. 281, 313.)

{¶ 13} When the children entered foster care, their problems became manifest. The three boys are autistic. The twins would often retain food in their mouths but not swallow. The foster mother had to teach all three boys to eat properly. (Tr. 16-17, 130-131.) The twins would often exhibit "interesting" behaviors, like excessive nail biting, age-inappropriate tantrums, and excessive

drooling. (Tr. 18-19, 31, 62.) In new settings, like a relative's home, Je.A. would hide under a chair. (Tr. 22, 68-70.) The foster parents have sought help for the twins at Ohio Guidestone, Help Me Grow, Galvin Learning Center, and Hopebridge Autism Center for mental health therapy, emotional therapy, sensory therapy, and speech therapy. Moreover, they have developed a day-long routine to accommodate the autism. (Tr. 29.) The foster parents also have a special sensory room, including safety features, designed for autistic children, as well as a safety sleeper for the twins, which was needed because Je.A. would wake up and go to Jo.A.'s bed and scratch and bite him. (Tr. 27-28, 30.)

{¶ 14} Oldest Son needs physical therapy for maintaining balance and walking and speech therapy. (Tr. 35.) This includes braces for his feet and legs. (Tr. 73.) The foster parent also noted that he has no "stranger danger" sense; he would walk off with anyone. (Tr. 34.) He further has therapy for emotional regulation and will receive Applied Behavior Analysis therapy for developing positive coping skills for children with autism. He also had services at the Constipation Clinic at MetroHealth Hospital. (Tr. 72-73.) When Oldest Son entered foster care, he needed wax removed from his ears and then tubes for his ears. He needed his tonsils and adenoids removed. (Tr. 88.) Oldest Son also needed glasses. (Tr. 129-130.) The foster parents were able to accommodate these medical needs.

{¶ 15} When Younger Daughter entered foster care, it was discovered that, although she was in the first grade, she could not read or spell her name. (Tr. 94.) At the time of trial, Younger Daughter had been in foster care for 19 months, she was

not doing well academically and was very behind in the second grade; she had a kindergarten reading level. (Tr. 104-105.) She had a short-term retention of things taught or mentioned; the foster mother said that the child was in a disassociated state. (Tr. 106.) She has sensory processing disorder and will need occupational therapy. (Tr. 95.)

{¶ 16} Mother had weekly two-hour visits with the four younger children. These generally went well, but the GAL reported that they were often chaotic with Mother "putting out fires" and the foster parents reported that the children have poor behaviors and were often ill when they return from the visits. Although the agency updated Mother on the children's conditions and services, Mother could not list the problems and services. (GAL's April 13, 2025 report.)

{¶ 17} The GAL recommended permanent custody of the four younger children. The GAL explained her recommendation as follows: "The children all have multiple special needs that require their caregiver to ensure that they receive services. Mother has historically failed to recognize, acknowledge or follow up on the children's needs. Mother is unable to retain information about the children's current needs." (GAL's April 13, 2025 report.)

{¶ 18} Regarding Mother's progress on her case plan, she completed a psychological evaluation through the trial court's diagnostic clinic in early 2024 and was recommended for further mental health services. Mother claimed to be involved with mental health services through MetroHealth, but the agency was not

able to verify these claims in the year prior to trial and Mother had not invited her provider to participate in agency discussions as requested.

{¶ 19} At trial, Mother testified that she attended counseling twice a week. However, the case worker testified that she had been unable to determine "what exactly [Mother] is addressing in her services." (Tr. 169.) The case worker testified that she was concerned for Mother's ongoing mental health and her grasp on reality, as demonstrated by recent statements Mother made to the children's caregivers which were not based in reality, including more than one occasion where Mother thanked the children's caregivers "for babysitting her children" and claimed that the agency was imminently planning to return the children to her care. (Tr. 169-170, 210-211.)

{¶ 20} The case worker was further concerned about Mother's transparency with the agency. For example, Mother failed to disclose to the agency the fact that she had gotten married and the case worker learned in February 2025 that Mother had gotten married in November 2024, just a few months after meeting her then-current husband, which even by Mother's own admission was "too short of time to get married." (Tr. 258-259.)

{¶ 21} According to the agency, Mother had not progressed beyond the weekly two-hour supervised visits because she had "not displayed any behaviors that would lead the Agency to believe that the children were safe in her care." (Tr. 198.)

{¶ 22} On June 12 and 13, 2025, pursuant to R.C. 2151.414(B), the trial court found by clear and convincing evidence that it was in the best interest of the children

to grant permanent custody to the Agency and that the children could not be placed with their parents within a reasonable time. Pursuant to R.C. 2151.414(B)(1)(d), the children had been in the custody of the Agency for 16 months, satisfying the provision that they had been placed with an agency for 12 or more months out of a consecutive 22-month period. Moreover, based on the evidence, the court concluded that Mother lacked the judgment and the ability to protect her children and meet their special needs.

## Mother's Assignment of Error

{¶ 23} Mother timely appealed and raised five assignments of error: (1) Mother was denied effective assistance of counsel in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution, (2) The trial court's decision was against the manifest weight of the evidence, (3) The trial court erred in not considering less severe alternatives and the agency did not make and document reasonable efforts for other alternatives, (4) The trial court improperly relied too heavily on a criminal plea and caused judicial prejudgment, and (5) The trial court failed to ensure meaningful language access and interpretation.

## Law and Analysis

## Trial Counsel Was Not Ineffective

{¶ 24} Mother's first assignment of error is that her trial counsel was ineffective for not objecting to the judge's prejudicial statement that it was a given fact Older Daughter had been molested, by failing to cross-examine the GAL, the

failure to address interpreter and comprehension issues, and not allowing Mother to "speak her truth" because trial counsel used too many leading questions.

{¶ 25} In order to establish a claim of ineffective assistance of counsel, Mother must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced her defense. *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989); and *State v. Reed*, 74 Ohio St.3d 534 (1996).

{¶ 26} In *Strickland,* the United States Supreme Court ruled that judicial scrutiny of an attorney's work must be highly deferential. The court noted that it is all too tempting for a defendant to second-guess his or her lawyer after conviction and that it would be all too easy for a court, examining an unsuccessful defense in hindsight, to conclude that a particular act or omission was deficient. Therefore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [claimant] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955); *see also In re Riley*, 2003-Ohio-4109, ¶ 18- 19 (4th Dist.).

{¶ 27} Moreover, even if Mother establishes that an error by her lawyer was professionally unreasonable under all the circumstances of the case, she must further establish prejudice; that is, but for the unreasonable error, there is a reasonable probability that the results of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Strickland* at 694. A court need not determine whether counsel's performance was deficient before examining prejudice suffered by the asserting party as a result of alleged deficiencies. *Bradley* at 143.

{¶ 28} Mother's first argument appears to be that her trial counsel should have objected to the judge's unwillingness to consider the possibility that Older Daughter had made up the claims of sexual abuse. This is not well-founded because J.A. pled guilty to the charges of rape and gross sexual imposition. A guilty plea is a complete admission of the defendant's guilt and the charge. *State v. Griggs,* 2004-Ohio-4415, ¶ 10, and *Lenard v. Russo,* 2012-Ohio-4236 (8th Dist.).

{¶ 29} Mother next argues that trial counsel should have cross-examined the GAL or called her or other family members as witnesses. However, failing to question witnesses on cross-examination and choosing not to present witnesses fall within the realm of trial strategy and tactics. Debatable tactics do not establish ineffective assistance of counsel. *State v. Leonard*, 2004-Ohio-6235, ¶ 146, and *In re Riley*, 2003-Ohio-4109, at ¶ 21 (4th Dist.).

{¶ 30} Moreover, trial counsel's strategy was obvious. He called Mother as a witness and had her acknowledge and recant her prior statements about calling Older Daughter a liar. He then showed that she had a job, a house with bedrooms and beds for her children, and a husband and relatives who would help with children and their needs. He had her affirm her willingness and ability to believe, protect, and care for her children. Thus, he argued that Mother should have custody of her children. His examination of Mother made this position very clear.

{¶ 31} Mother's last objection is that trial counsel made no record as to whether she fully understood the interpreter's translations. However, with no record, the court is left with only speculation as to whether Mother understood. Speculation is not a sufficient foundation upon which to base a claim of ineffective assistance of counsel. *In re Riley,* at ¶ 21.

{¶ 32} The court further notes that at the end of trial the judge thanked the attorneys "for their zealous and careful advocacy in this matter." (Tr. 323.)

{¶ 33} Finally, Mother has not established prejudice. The arguments do not undermine this court's confidence in the outcome of the proceedings. In recommending permanent custody to the agency the GAL stated the following: "The children all have multiple special needs that require their caregiver to ensure that they receive services. Mother has historically failed to recognize, acknowledge or follow up on the children's needs. Mother is unable to retain information about the children's current needs." Mother was unable to refute those conclusions.

{¶ 34} The first assignment of error is overruled.

## Permanent Custody Determination Supported by Manifest Weight of the Evidence

{¶ 35} In her second assignment of error, Mother argues that the decision was against the manifest weight of the evidence.

## Standard of Review and Permanent Custody Statute

{¶ 36} The juvenile court has exclusive jurisdiction to determine the custody of any child not a ward of another court of this state. R.C. 2151.23(A)(2). "It is well

recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Murray*, 52 Ohio St.3d 155, 157 (1990). Thus, "the overriding principle in custody cases between a parent and nonparent is that [biological] parents have a fundamental liberty interest in the care, custody, and management of their children." *Hockstok v. Hockstok*, 2002-Ohio-7208, ¶ 16, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "This interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution." *Hockstok* at *id.*, citing *Santosky* at *id.*, and *In re Shaeffer Children*, 85 Ohio App.3d 683, 689-690 (3d Dist.1993). A parent's interest, however, is "'always subject to the ultimate welfare of the child.'" *In re M.J.M.*, 2010-Ohio-1674, ¶ 15 (8th Dist.), quoting *In re B.L.*, 2005-Ohio-1151, ¶ 7 (10th Dist.).

{¶ 37} A trial court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have found that the essential statutory elements for an award of permanent custody have been established by clear and convincing evidence. *In re B.P.*, 2019-Ohio-2919, ¶ 22 (8th Dist.). The Supreme Court of Ohio recently clarified this standard in *In re Z.C.,* 2023-Ohio-4703.

> "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a

manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."

*Id.* at ¶ 14.

{¶ 38} "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.* at 477.

{¶ 39} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors under R.C. 2151.414(B)(1)(a)-(e) exists and that permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

**R.C. 2151.414(B)(1)**

{¶ 40} R.C. 2151.414(B)(1) governs the first step in an agency's motion for permanent custody and contains five factors. *In re R.H.*, 2022-Ohio-3765, ¶ 21 (8th Dist.). The trial court here made two of the findings. First, under R.C. 2151.414(B)(1)(a), the trial court found that the children had been in the agency's custody from October 23, 2023, to September 23, 2024, when the agency

moved to modify temporary custody to permanent custody.  Thus, they had been in the agency's custody for less than 12 months.  Nevertheless, the court found that the children "cannot be placed with either of [their] parents within a reasonable time or should not be placed with [their] parents."  "A trial court's finding that it cannot or should not place a child with a parent precludes the court from considering returning the child to Mother's custody." *In re T.S.*, 2024-Ohio-827, ¶ 61 (8th Dist.).

{¶ 41} In determining whether a child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, the juvenile court must consider "all relevant evidence," including specific factors enumerated in R.C. 2151.414(E).  If the juvenile court finds by clear and convincing evidence that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.  R.C. 2151.414(E).

{¶ 42} The court found that pursuant to R.C. 2151.414(E)(10), the father of Younger Daughter had abandoned her.  Pursuant to R.C. 2151.414(E)(4), (5), (7), (12), (14), and (15), the father of the boys was incarcerated for the rape of their older sister and could not provide for them.

{¶ 43} Relative to Mother, the trial court ruled that the testimony clearly and convincingly established that the risk of harm to the children is too great to justify reunification.  The boys have extreme special needs.  They will need extensive help to manage issues concerning food, speech, sensory and emotional regulation, and

behavior to counter their autism. The evidence clearly showed that Mother had difficulty caring for and working toward the development of the boys when they were in her care. Similarly, Mother's lack of care and attention put Younger Daughter way behind in her development. Furthermore, Mother minimized the special needs of her children.

{¶ 44} Instead of caring for her children, Mother prioritized her relationship with a man who pled guilty to molesting her daughter. She did not believe Older Daughter and tried to get her diagnosed as schizophrenic to discredit her testimony. Mother made incredible statements about Older Daughter being jealous of her relationship with J.A. and wearing Mother's semen-stained underwear. Mother continued her relationship with the molester after he was in prison by continually talking to him in phone conversations that stopped only after the agency told her it could get a log of those calls. Mother did not believe Younger Daughter's accusation that J.A. also molested her. Mother showed questionable judgment by marrying a new boyfriend just two months after apparently ending her relationship with the molester. Furthermore, she seemed less than candid with her new husband about her children's situation.

{¶ 45} In regard to the best interest of the children, the record shows that the juvenile court considered all relevant best-interest factors, including the enumerated factors under R.C. 2151.414(D)(1)(a)-(e). The juvenile court included several findings under R.C. 2151.414(E) in its judgment. Relative to Mother, the court found (1) a failure to remedy the situation that caused her children to be

removed from the home (R.C. 2151.414(E)(1)); (2) a lack of commitment to the children (R.C. 2141.414(E)(4)); and (3) an unwillingness to provide basic necessities for the children and to prevent them from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect (R.C. 2151.414(E)(14)). The juvenile court concluded that permanent custody was in the children's best interest, stating,

> The testimony clearly and convincingly established that the risk of harm to all five children is too great to justify reunification. The Court finds that extending temporary custody for any of the four youngest children is not an option because the mother does not believe she needs further services to protect and care for her children. She has shown this through her actions, her testimony, and her arguments to the court [demonstrate] that a further extension of temporary custody will not accomplish reunification. And this is not the case where the mother is asking for more time to complete the case plan. The mother's testimony did not persuade the court that reunification was in the children's best interest.

{¶ 46} The trial court's ruling that permanent custody of the children to agency was not against the manifest weight of the evidence. The second assignment of error is overruled.

**Less Severe Alternatives Considered and Reasonable Efforts Made**

{¶ 47} In her third assignment of error Mother argues that less severe alternatives were not considered and the agency did not make reasonable efforts to effect reunification. R.C. 2151.419(A) requires the agency to make reasonable efforts to prevent the removal of the children from the home or to make it possible to return the children to the home.

{¶ 48} The trial court's opinion addresses that issue and concludes that such efforts would be futile. For the reasons quoted above in addressing the best interest

of the children, the juvenile court found that Mother's failure to recognize the children's severe specialized needs would put them at great risk if returned to her. Simply, Mother was unable to provide the protection her children need.

{¶ 49} On this record, the third assignment of error is without merit and overruled.

**No Error Committed by Treating J.A.'s Criminal Plea as Conclusive Evidence**

{¶ 50} Mother's fourth assignment of error that the juvenile court erred in accepting J.A.'s guilty plea as conclusive proof of the molestation and not conducting an independent examination on the molestation issue is not well-founded. A guilty plea is a complete admission of the defendant's guilt and the charge. *Griggs,* 2004-Ohio-4415, at ¶ 10, and *Russo,* 2012-Ohio-4236, at ¶ 1 ( 8th Dist.).

{¶ 51} The fourth assignment of error is overruled.

**The Trial Court Ensured Meaningful Language Access and Interpretation**

{¶ 52} Mother states that she is primarily fluent in Spanish and has only a limited proficiency in English. She argues that the proceedings were unfair because the evidence concerned technical diagnoses and treatments and complex questions posed to the witnesses, including herself. Thus, Mother contends, it should be concluded that the translation services were necessarily inadequate. Furthermore, the GAL report was furnished only in English. According to Mother, she was prevented from being able to respond to it in any meaningful way.

**{¶ 53}** This argument is unpersuasive. Pursuant to Sup.R. 48.06(A)(2), the GAL properly served his report on Mother's attorney, not Mother herself. As discussed earlier, Mother's attorney's strategy was to demonstrate through Mother's testimony that she was ready and able to care for her children again and thus counter the GAL report. Moreover, the juvenile court provided interpreters, often two, throughout the proceedings for Mother. The trial judge advised people in the court of the need to speak slowly and clearly for the interpreters (tr. 5) and took care to make sure the interpreter was in position to fulfill the job's duties. (Tr. 245-246.) During the May hearing, the interpreter asked several times for people to slow down (tr. 161, 176-177) or to repeat something (tr. 144, 254, 260, and 262). Moreover, a review of the transcript shows no indication that Mother did not understand the proceedings.

**{¶ 54}** The fifth assignment of error is overruled.

**{¶ 55}** Judgments affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

MARY J. BOYLE, P.J., and
SEAN C. GALLAGHER, J., CONCUR